## Sierra Club et al. *v.* Sanitary Water Board.

Argued June 3, 1971, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR.; MENCER and ROGERS.

*John D. Killian,* with him *Killian & Gephart, Rolf R. Larsen* and *Larsen, Murray & O'Neill,* for appellants.

*Richard B. Springer,* Assistant Attorney General, with him *Allen B. Zerfoss,* Assistant Attorney General, and *J. Shane Creamer,* Attorney General, for appellee.

*David L. Baird,* with him *Baird, McCamley & Miller,* for intervenor, Kristianson and Johnson Coal Company, Inc.

OPINION BY JUDGE MENCER, September 10, 1971:

As the noted legal luminary, Karl Llewellyn, once said, "Law . . . begins when someone takes to doing something someone else does not like." These words seem particularly appropriate in this case which is an appeal from an adjudication of the Sanitary Water Board (Board) which,[1] over appellants' objections,

---

[1] The Sanitary Water Board consisted of the Secretary of Health, who was the chairman, the Secretary of Forests and Waters, the Secretary of Mines, the Executive Director of the Pennsylvania Fish Commission, the Secretary of Commerce, and three members of the general public. See the Administrative Code, the Act of April 9, 1929, P. L. 177, as amended by the Act of August 14, 1963, P. L. 1119, 71 P.S. §149. The Chairman of the State Soil and Water Conservation Commission was added by Section 1 of the Act of July 31, 1970, P. L.     , No. 222, 35 P.S. §691.1.

granted a permit to Kristianson & Johnson Coal Co.,
Inc. (K. & J.) for the discharge of industrial waste
and mine drainage from a proposed bituminous coal
strip mine in Chest Township, Clearfield County, and
Chest Township, Cambria County. The mine drainage
application, filed on May 25, 1970, pursuant to the then
applicable Section 315 of the Clean Streams Law, Act
of June 22, 1937, P. L. 1987, as amended by the Act of
August 23, 1965, P. L. 372, embraced 1,707.19 acres, but
the total "land affected"[2] by such mining would be 1,-
273.15 acres of the watershed of Rogues Harbor Run,
a tributary of Chest Creek. Rogues Harbor Run is the
source of trout fishing enjoyment for many members
of the organizations here represented, as well as the
source of water supply for the Westover Water Au-
thority, which supplies water for the use of Westover
Borough, a community in Clearfield County with an
approximate population of 500.

The primary contention of appellants is that the
proposed K. & J. strip mine operation will cause sedi-
mentation which will degrade the quality of Rogues
Harbor Run as a fishing stream and adversely affect it
as a domestic water supply for Westover Borough.

---

The Sanitary Water Board was abolished by Section 30 of the
Act of December 3, 1970, P. L.    , No. 275, creating the Depart-
ment of Environmental Resources. "All orders, permits, regula-
tions, decisions and other actions of . . . (the) board . . . remain
in full force and erfect" under Section 34 of the same act, how-
ever, "until modified, repealed, suspended, superseded or otherwise
changed by appropriate action of the agency assuming the applica-
ble powers and duties. . . ." Under Section 35(b), this agency is
now the Department of Environmental Resources, and references
hereafter made to the Board should be construed as now applica-
ble to the Department of Environmental Resources.

2 "Land affected shall mean the land from which the over-
burden is removed and that occupied by the spoil piles." Section 3
of the Bituminous Coal Open Pit Mining Conservation Act, Act of
May 31, 1945, P. L. 1198, as amended, 52 P.S. §1396.3.

The plan of operation of K. & J., after being made subject to 26 "Standard Conditions" and six "Special Conditions", was approved by the Department of Mines and Mineral Industries, the reporting agency[3] for the Sanitary Water Board. The Board unanimously adopted the favorable recommendation of its reporting agency on July 15, 1970, and approved the issuance of a permit, but because the Board had been advised of the objections of various groups to the granting of a permit, the permit was withheld and hearings followed on August 4, 20, and 21, and September 21 and 22 at which testimony and exhibits were received from K. & J., the protestants, and the Department of Mines and Mineral Industries. On January 18, 1971, the Board issued the adjudication and order appealed from here. Appellants wish us to set aside the Board's decision and to remand the matter to the Board "for further proceedings consistent with the provisions of Act No. 222" (the Act of July 31, 1970, P. L.    , No. 222, 35 P.S. §691.1 et seq.).

Intervening appellee, K. & J., filed a Motion to Quash on April 13, 1971, to which an Answer was filed by appellants on April 27, 1971. We conclude that the contentions made in the Motion are without merit, and therefore it is denied.

Turning to the merits, appellants make the following contentions:

(1) Contrary to the weight of the evidence, which proved that sedimentation would enter the stream, the Board decided that the proposed operation can be con-

---

[3] Section 2(a) of Article 900 of the Rules and Regulations of the Sanitary Water Board provided: "Reporting agency shall mean the Commonwealth agency responsible to the Board for certain investigating, reporting and enforcement duties. In the case of bituminous strip mines the reporting agency shall be the Department of Mines and Mineral Industries. In other cases the reporting agency shall be the Department of Health."

ducted without resulting in pollution[4] of Rogues Harbor Run.

(2)   The Board erred in finding that K. & J.'s mining operations under another permit at nearby Rock Run Creek do not provide a basis for determining whether it could properly operate the proposed operation.

(3)   The Board erred in permitting K. & J. to file less than a complete set of plans.

As to the *first* contention, appellants acknowledge that "If this sedimentation was *excessive,* it would be harmful to aquatic life and to the use of the stream as a domestic water supply.   Thus, the question is whether the sedimentation that would in fact occur might become *excessive.*" (Emphasis added)  On this point, appellants point to the testimony of Mr. David Yost, a soil scientist with the Soil Conservation Service, to the effect that he had made a study of the soils in the Rogues Harbor Run area and had calculated that "for a five year frequency storm, from 93,367 to 107,650 cubic yards of silt loam would be moved into Rogues Harbor Run *if no vegetation is planted prior to the storm.*" (Emphasis added)  This study, however, was based on a formula from a technical manual used by the Soil Conservation Service.   In applying the formula, which was marked "tentative" and published in

---

[4] Section 1 of the Clean Streams Law, at the time of K. & J.'s application, provided in part:  " 'Pollution' shall be construed to mean noxious and deleterious substances rendering unclean the waters of the Commonwealth to the extent of being harmful or inimical to the public health, or to animal or aquatic life, or to the use of such waters for domestic water supply, or industrial purposes, or for recreation.  The Sanitary Water Board shall determine when the discharge of any industrial waste, or the effluent therefrom, constitutes pollution, as herein defined, and shall establish standards whereby and wherefrom, so far as reasonably practicable and possible, it can be ascertained and determined whether any such discharge does or does not constitute pollution as herein defined."

March, 1970, Mr. Yost testified that it was assumed that the entire area would be bare and have no vegetation, that if vegetation was present that a different formula would have to be used, and that he had not examined the plan of operation or given consideration to the diversion ditches, the planting that is to be required under the plan as stripping progresses or other controls that were set forth in the plan.

We are hardly stream pollution experts, and, as the Supreme Court's words in *Blumenschein v. Housing Authority of Pittsburgh*, 379 Pa. 566, 572-573, 109 A. 2d 331, 334-335 (1954), indicate,[5] our review is limited, but we tend to agree with appellee that "Siltation is not a problem for which standards may be easily established and enforced. Some silt may be useful to a stream, but the precise point at which it becomes harmful is not clear. Nor are many of the common sources, such as plowing of farm fields, adequately controlled. Nevertheless, it is known that excessive silt in a stream is definitely injurious to certain types of aquatic life, and flagrant examples of excessive siltation may be readily recognized. *Consequently the best way to deal*

---

[5] "By a host of authorities in our own and other jurisdictions it has been established as an elementary principle of law that courts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion, in the absence of bad faith, fraud, capricious action or abuse of power; they will not inquire into the wisdom of such actions or into the details of the manner *adopted to carry them into execution.* It is true that the mere possession of discretionary power by an administrative body does not make it wholly immune from judicial review, but the scope of that review is limited to the determination of whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions. That the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; *judicial* discretion may not be substituted for *administrative* discretion." (Emphasis in original).

*with the problem, at this time, is to require that mean-ingful preventive safeguards be incorporated in any plan of an operation where the potential for excessive siltation exists.* K. & J., the applicant in this case, has made a concerted effort to devise such preventive meas-ures; in fact, one of the best proposals yet received by the Department." (Emphasis added)

As to the *second* contention, it would appear that K. & J. has significantly changed its plan of operation for the present tract as opposed to its methods at the Rock Run Creek location. As appellee points out, ". . . K. & J.'s proposed operation on Rogues Harbor Run differs in two major particulars: (1) all haul roads are to be constructed on the spoils of the operation or at an elevation higher than the mined areas, whereas in the Rock Run operation there were no conditions on the location of the haul roads. To the extent there was any problem with siltation on that Rock Run opera-tion, it was due to the silt in the drainage from the haul roads, which were constructed below the mined area. This drainage reached the stream without any settling. This situation has been remedied by the building of settling ponds intermittently along the haul roads to direct the drainage in the ditches from the stream temporarily to enable settling of silt to occur. (2) The mining is to progress in a checkerboard fash-ion, which significantly decreases the possible area ex-posed at any one time. In any event, K. & J. was never found to be in violation on its Rock Run operation, and the latest biological study of the stream in July of 1970 revealed that Rock Run is progressly improving in its ability to support aquatic life."

Appellants' *third* contention is urged because the plans "did not show the annual waterfall, composition of the soil, slope of the land, or quantity of water which will drain over, around and through the proposed min-

ing operation." This information was not required, however, and, in the Board's educated opinion, not particularly helpful.[6]

---

[6] Although for reasons of space we have not included here the elaborate operation plan of K. & J. or the 32 conditions attached to the Board's approval, we quote here the Board's reasoning as to appellants' third contention:

"First, the quantity of rainfall and the slope of the land are relevant only to the capacity of the settling ponds constructed to handle surface runoff. However, the water from the pit going into settling ponds is pumped. Quantity of water going into these ponds is, therefore, easily regulated, and any excess drainage can be retained in the pit until such time as adequate space is available in the treatment ponds. The water from the ditches of the haul roads goes into the pit, and creates no problem in this regard. The water from the diversion ditches above the highwall is channeled to the 50 foot barrier areas of undisturbed ground, which will be able to filter substantial quantities of water. In any event, the location and size of the diversion ditches will be constantly changing. When mining in the first pit is completed, the adjoining highwall area where the first diversion ditch was located is blasted with dynamite, and the overburden therefrom placed in the first pit. Prior thereto another diversion ditch will have been constructed back further on the highwall, so as to divert the surface drainage from the new second pit. Thus, the location and size of the diversion ditches on the highwall will be constantly changing. If diversion ditches and settling ponds become necessary to prevent siltation from the initial spoil pile and the restored areas, these will, of necessity, be of such size and location as conditions warrant.

"The composition of the soil is relevant to the quantity of silt and sediment that a given area will produce. If the collection and filtration and settling facilities are adequate, the quantity of siltation produced by a given area is relevant only to the frequency with which the ponds will have to be cleaned or constructed elsewhere. This will vary with the peculiar circumstances of the area.

"The specific types of grasses, legumes and trees that will be planted on the backfilled areas is highly dependent on the precise type and composition of the soil on the surface of the backfill. Accordingly they cannot be designated until the backfilling has taken place, and then must be approved by the Department of Mines and Mineral Industries (now a part of the Department of Environmental Resources)."

In this proposed operation, in the opinion of the Board, provisions have been made for the control of all the potential sources of excessive siltation from this proposed mining operation. "We must say with respect to this finding that it is the primary function of the Sanitary Water Board to protect the waters of the Commonwealth for the benefit of all the people. From the time The Clean Streams Law was first passed in 1937 the Sanitary Water Board has made many investigations into the various aspects of pollution and we feel that the board thereby has acquired a special knowledge and competence with regard to these matters." *Sanitary Water Board v. City of Wilkes-Barre,* 78 Dauph. 328, 334, aff'd, 199 Pa. Superior Ct. 492, 185 A. 2d 624 (1962). "[T]he Administrator's policies are made in pursuance of official duty, based upon more specialized experience and broader investigations and information than is likely to come to a judge in a particular case. . . . We consider that the rulings, interpretations and opinions of the Administrator . . ., while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.,* 323 U.S. 134, 139-140, 65 S. Ct. 161, 164 (1944), cited with approval in *Hogan Unemployment Compensation Case,* 169 Pa. Superior Ct. 554, 558-559 n.2, 83 A. 2d 386, 389 n.2 (1951) ("When an administrative board rests its conclusion upon *its own official experience* the courts generally respect its special competence." (Emphasis in original)).

We fully understand appellants' concern that this proposed strip mine is likely to be ". . . harmful or inimical to . . . aquatic life [of Rogues Harbor Run], or to the use of such waters for domestic water supply . . .", but *at this point* (1) we have faith in the Board's acumen in these matters and feel that it has thoroughly considered this matter (particularly so because it is hypertensively involved in ecological improvement in the Commonwealth), and (2) we rely heavily that "Special Condition" No. 2 (that, as an additional safeguard, "prior to activating of this mining operation, . . . all facilities shall be inspected and approved by the District Mine Inspector . . . .") will effectively cure any defects in the operation plan, and that subsequent inspections (which in the past have been approximately weekly or biweekly) in accord with the provisions of the Bituminous Coal Open Pit Mining Conservation Act, *supra,* will do the same.

We applaud the civic spirit demonstrated by the several appellants, but we nevertheless fail to find the requisite "manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions."

Order affirmed.