**PULLMAN INCORPORATED (Pullman-Standard Division)**

v.

**John A. VOLPE, Secretary of United States Department of Transportation, et al.**

**Civ. A. No. 71-2442.**

United States District Court,
E. D. Pennsylvania.

Dec. 14, 1971.

Philip H. Strubing, Peter Hearn, Marjorie G. Marinoff, of Pepper, Hamilton & Scheetz, Philadelphia, Pa., for plaintiff.

Warren Mulloy, Asst. U. S. Atty., Philadelphia, Pa., Joseph A. Blundon, Washington, D. C., Lewis VanDusen, David Bruton, Philadelphia, Pa., Remo M. Croce, Camden, N. J., for defendants.

## OPINION

HUYETT, District Judge.

Plaintiff seeks to enjoin Southeastern Pennsylvania Transportation Authority ("SEPTA") and New Jersey Department of Transportation ("NJDOT") from awarding contracts to the General Electric Company ("GE") for the design, construction, testing, delivery and guaranteeing of 214 railroad commuter cars, and to require SEPTA and NJDOT to award these contracts to plaintiff Pullman Incorporated as the lowest responsible responsive bidder even though GE's bid was the lowest bid received. Plaintiff also seeks injunctive relief prohibiting defendant John A. Volpe, ("Secretary") Secretary of the United States Department of Transportation ("USDOT") from agreeing to and concurring in the award of the contracts by SEPTA and NJDOT to GE, and requiring the Secretary to agree to and concur in the award of contracts by SEPTA and NJDOT to plaintiff as the lowest responsible responsive bidder.

Plaintiff claims that the bid submitted by GE did not conform to the specifications established in the Invitation to Tender and Information for Bidders, Forms of Contract, Bond and Contractor's Proposal and Specifications ("Invitation") and the Addenda to the Invitation. Plaintiff asserts that a nonconforming bid must be rejected by SEPTA and NJDOT under their respective procurement regulations, and by USDOT under the Federal Procurement Regulations (FPR), and that the failure of these agencies to do so was arbitrary, unreasonable and outside the scope of their discretion.

There are presently two motions before the Court.[1] Plaintiff seeks a preliminary injunction against the defendants to preserve the status quo until a hearing on the merits is held. Defendants have moved to dismiss the complaint on the grounds that this Court does not have jurisdiction and that plaintiff lacks standing to sue. The question of jurisdiction and standing shall be considered first.

Plaintiff states that this Court has jurisdiction under 28 U.S.C. §§ 1331(a), 1332(a) and 5 U.S.C. §§ 701–706.

### I. *Federal Question Jurisdiction*

Plaintiff seeks to invoke this Court's jurisdiction under the "federal question" provision, 28 U.S.C. § 1331(a) which provides in relevant part:

"The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy . . . arises under the . . . laws . . . of the United States."

---

1. On October 14, 1971, after argument by counsel on October 13 and 14, 1971, and submission of Briefs, plaintiff's motion for a Temporary Restraining Order was denied.

Plaintiff. argues that its complaint states a claim that arises under the Urban Mass Transportation Act, 49 U.S.C. §§ 1601–1612 ("UMTA"), and the Administrative Procedure Act, 5 U.S.C. §§ 701–706 ("APA").

Defendants deny that there is federal question jurisdiction over plaintiff's claim. They assert that plaintiff has not raised a substantial question under the APA and the UMTA which is reviewable by this Court. They also claim that plaintiff does not have standing under these statutes because plaintiff has not been aggrieved by agency action within the meaning of a relevant statute.

A. *Reviewability of the action of the Secretary*

Plaintiff urges this Court to review the decision of the Secretary approving the grant to SEPTA and NJDOT for the contracts with GE. It argues that the APA, which provides for judicial review of agency action, is applicable to this case through 49 U.S.C. § 1655 of the Department of Transportation Act of 1966 ("DOT Enabling Act"), 49 U.S.C. § 1651 et seq., and 49 U.S.C. § 1602 of UMTA.

The section cited by plaintiff in its argument that there is judicial review of the Secretary's action states in relevant part:

"The provisions of subchapter II of chapter 5 and of chapter 7 of Title 5, shall be applicable to proceedings by the Department and any of the administrations or boards within the Department established by this chapter . . . 49 U.S.C. § 1655(h)."

Plaintiff claims that this judicial review is applicable when the Secretary abuses his limited discretion which is set forth in §§ 1602(e) and 1603(a) of UMTA.

■ The issue is whether the statutes in question actually subject the Secretary's concurrence in the grant to SEPTA and NJDOT for the contract with GE to judicial review. The section cited, 49 U.S.C. § 1655(h), by its terms applies only to "proceedings" of the Depart-

ment. "Agency proceedings" are defined in 5 U.S.C. § 551 as rule making, adjudication and licensing. The present action by the Secretary was not such a procedure as 49 U.S.C. § 1655 was intended to cover.

■ The fact that the DOT Enabling Act and UMTA did not specifically provide for judicial review of the Secretary's action is not dispositive. "There is no presumption against judicial review and in favor of administrative absolutism (see Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 1510–1511, 18 L.Ed.2d 681), unless that purpose is fairly discernible in the statutory scheme." Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 157, 90 S.Ct. 827, 831, 25 L.Ed. 2d 184 (1970). The APA, 5 U.S.C. § 701(a), states that its provisions for review apply except to the extent that (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law. The question is whether UMTA committed this decision to the Secretary's discretion.

■ Courts have indicated several criteria in determining whether a statute has committed a particular decision to agency discretion. A determination that a statute is permissive rather than mandatory indicates a discretionary decision, e. g. Rasmussen v. United States, 421 F. 2d 776, 779–780 (8 Cir. 1970); Mollohan v. Gray, 413 F.2d 349, 351 (9 Cir. 1969). If the statutory standards are expressed in broad, general concepts rather than specific guidelines, so that the very construction of the statute is an exercise of discretion, reviewability of the agency action will be severely restricted to abuses. Panama Canal Co. v. Grace Lines, Inc., 356 U.S. 309, 318, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958); Kendler v. Wirtz, 388 F.2d 381, 383 (3 Cir. 1968). Discretion in the agency will be recognized when the determination in question requires the exercise of expert judgment within the special competence of the agency rather than an essentially legal determination. Panama Canal Co. v. Grace Lines, Inc., *supra*; Kendler v.

Wirtz, *supra*; Szmodis v. Romney, 307 F.Supp. 607 (E.D.Pa.1969). The question is whether Secretary Volpe's concurrence in the grant to SEPTA and NJDOT after the contract was awarded to GE exceeded any discretion given to him by the statute.

■ Plaintiff argues that the Secretary was bound by specific guidelines and was not free to develop his own criteria for making grants in a situation such as this. Plaintiff's argument takes a circuitous route which begins at 49 U.S.C. § 1656(a) which provides that the Secretary shall develop and revise criteria for the formulation and evaluation of all proposals for the investment of Federal funds in transportation equipment, except in certain enumerated circumstances, including grant-in-aid programs authorized by law. Plaintiff asserts that § 1656(a) limits the Secretary's discretion in making grants under UMTA. Plaintiff points to 49 U.S.C. §§ 1602(e) and 1603(a) to demonstrate that Congress had given only limited discretion to the Secretary. It argues that Congress in 49 U.S.C. § 1602(a) gave the Secretary only the authority to prescribe further terms and conditions in accordance with the limitations imposed by the act. Among these further terms and conditions was the requirement that there be fair, open and competitive bidding for contracts to which grants were applied. Capital Grants for Urban Mass Transportation Information for Applicants, p. 17 (November, 1970) ("Information for Applicants"); Procedural Guide for Project Sponsors, p. 18 (July, 1969) ("Procedural Guide"). Plaintiff asserts that through the limitations imposed by Congress and the regulations issued by USDOT, the Secretary was bound by the bidding requirements of FPR, 41 CFR § 1–1.000 et seq., or their equivalent, in determining whether a grant should be made to a local authority for the purchase of equipment. It claims that the Secretary disregarded these bid requirements in concurring in the grant to SEPTA and NJDOT for their contracts with GE. It is clear that the bidding requirements of FPR do not apply to this case. The provisions of FPR are specifically limited to the procurement of personal and non-personal property by Federal agencies.[2] The present case involves a grant-in-aid to local authorities who are procuring equipment and it cannot be considered a procurement by a Federal agency. The Federal Government will have no proprietary interest in the purchased cars which will be entirely owned and controlled by the local authorities.

It may be conceded that the discretion of the Secretary under UMTA is limited by certain provisions of the act. The act provides particular standards which must be met if the Secretary is acting under certain circumstances. The Secretary must give special consideration if the funds are to be used to purchase the facilities of or compete with a private transit company, § 1602(e); he must determine that the grant applicant is carrying on an adequate relocation program, § 1606; he must make determination that the equipment for which the assistance is sought is necessary for a coordinated and unified urban transportation system, § 1603(a); he must ensure that certain labor standards are met, § 1609; and he must follow specified procedures to ensure environmental protection, § 1610.

■ The act does not establish standards for competitive bidding procedures which must be satisfied before a grant may be awarded towards a contract for transportation equipment. The only section that mentions competitive bidding, §

2. 41 CFR § 1–1.002—Purpose:
   This subpart establishes the Federal Procurement Regulations Systems for the codification and publication of uniform policies and procedures applicable to Federal agencies in the procurement of personal property and non-personal services (including construction) and the procurement of real property by lease. . . .

1608(b), clearly foresees the possibility that it will not even be employed.[3]

■ In § 1602(a) the Secretary is authorized to make grants to assist State and local public bodies and agencies in financing the purchase of equipment "on such terms and conditions as he may prescribe". The responsibility of the Secretary is to fulfill the broad congressional purposes of § 1601 and § 1601(a). With the exception of those areas in which the statute expresses concern for particular interests, e. g. private enterprise, displaced persons, labor, and the environment, the Secretary determines the procedure to be applied and the grants to be made. Within those limitations the statute is permissive, provides only the broadest conceptual guidelines for action, and requires highly developed expertise in the determination of the conditions under which the grant of assistance will fulfill the broad congressional purposes.

The statute envisions the development of state and local bodies which are entrusted with the formulation of plans for the establishment of urban transportation systems. 49 U.S.C. § 1601(b) (2). The Secretary is to provide assistance in financing the systems to be operated by public or private mass transportation companies as determined by local needs. 49 U.S.C. § 1601(b) (3). The Secretary, before making grants or loans must determine that the applicant has the legal, financial and technical capacity to carry out the project and will retain satisfactory continuing control over the use of the facilities and equipment. The statutory scheme of UMTA emphasizes the large role to be played by the local bodies responsible for urban mass transit.

The Secretary, in the broad discretion that has been given to him to fulfill the statutory purpose, has issued regulations and procedures for applicants. These regulations require the use by the applicant of competitive bidding procedures in the awarding of large contracts. The Procedural Guide, at 19, requires that the project sponsor obtain concurrence prior to formal advertising for bids on contracts costing more than $2500. The agency must receive the proposed advertisement for bids, the proposed contract form, plans and specifications, and related bidding documents. Any proposed change in specifications or other bid documents must be submitted for concurrence prior to issuance. The regulations require that any equipment contracts will be awarded to the lowest responsible bidder.

The regulations, however, do not require the prior concurrence by UMTA in the award of a contract unless the proposed award is to other than the apparent low bidder or the amount of the contract will require a budget revision. The sponsor may award the bid to other than the low bidder with the prior concurrence of the authority when the *project sponsor* determines that the low bid is not responsive, or the low bidder is not responsible or should be disqualified for some other reason. Procedural Guide, 20. If the applicant for the grant awards the contract to the low bidder the contract may be executed, and then the sponsor shall submit a copy of the relevant documents including a copy of the bid proposal selected, a conformed and bound copy of the executed contract, a copy of the notice to proceed, and an opinion of the sponsor's attorney that all requirements of State and local law have been met.

■ The regulations of the Secretary leave the responsibility for determining the conformity of the bid to the local authority, which can sign a contract with the low bidder without the prior concurrence of UMTA. This reliance on the local or state group is consistent with the statute's encouragement of local responsibility in urban mass transportation. The statute does not promote a centralized procedure which leaves all

---

3. We are not holding that the Secretary could have disregarded competitive bidding entirely in the program for grant-in-aid, but only that the statute did not provide any standards for reviewing the Secretary's actions with regard to bidding.

decisions with the Secretary but rather, emphasizes local solutions to problems. Working within this framework it is proper for the Secretary to place determinations of responsiveness of bids among the responsibilities of the local agency. The Secretary must make an initial determination that the proposed contract and the specifications do not violate the intentions of Congress. It is not necessary for him, in order to fulfill the purposes of Congress, to protect the other bidders if the procedure employed is sufficient to meet the standards and accomplish the goals set in the statute. It is within the Secretary's discretion to proceed in the manner indicated in the regulations.

▆▆ Plaintiff is asking the Court to determine that the GE bid did not conform to the specifications. This determination would require extensive testimony concerning the specifications, the proposals by GE and the significance of any differences. Findings by the Court would require detailed understanding of the engineering techniques and principles involved, and the purposes and goals of the transportation plan as they relate to the specifications and the proposals. This is precisely the type of question that "does not present questions of an essentially legal nature in the sense that legal education and lawyers' learning afford peculiar competence for their adjustment." Driscoll v. Edison Light & Power Co., 307 U.S. 104, 122, 59 S.Ct. 715, 724, 83 L.Ed. 1134 (Frankfurter, J., concurring.) It is not a case like Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970) in which the dispute related to construction of a statutory term, a controversy peculiarly within the competence of the court, and not one within the special competence of the agency. The issues which plaintiff urges upon the court are the type that require expertise in the areas of transit planning and construction. Congress, in UMTA, provided for grant-in-aid channeled through an agency with expertise in transportation matters, to local authorities which were charged with the formulation and execution of the transportation plans. This statutory scheme, therefore, involved two bodies which were equipped to make decisions of the type challenged in this case. A court does not have the expertise to make a knowledgeable decision on such matters Courts should avoid cases which would involve extensive hearings of a highly technical nature and the interpretation of technical and esoteric regulations and specifications. *See* M. Steinthal & Co., Inc. vs. Seamans, 455 F.2d 1289 (D.C. Cir., filed Oct. 14, 1971). Since Congress has provided for the participation of two organizations with expertise in the particular area of concern, and the courts are a singularly unqualified participant in such considerations, it is reasonable to believe that in the absence of a specific provision for reviewability, Congress intended matters of the type involved here to be within the discretion of the Secretary and the local authority.

B. *Standing of plaintiff to sue under 5 U.S.C. § 702*

Plaintiff claims that it has standing to sue under 5 U.S.C. § 702 which states:

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review thereof."

Plaintiff, as a disappointed bidder, asserts that it is aggrieved by the action of the Secretary within the meaning of UMTA, DOT Enabling Act and FPR.

The Supreme Court recently dealt with the question of standing under 5 U.S.C. § 702 and held that the test for standing under § 702 is " . . . whether the interest sought to be protected by the *complainant is arguably within the zone of interests to be protected or regulated by the statute . . . in question."* Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). There is no need for an explicit statutory provision for standing. Hardin v. Kentucky Utilities Co., 390 U.S. 1, 88

S.Ct. 651, 19 L.Ed.2d 787 (1968). Where statutes are concerned, the trend is toward granting standing to more persons as "aggrieved persons" to protest administrative action.

Pullman asserts that its interest as a disappointed bidder gives it standing to challenge the action of the Secretary in approving these grants when GE's bid was non-conforming. It claims that its interests are within those meant to be protected by the DOT Enabling Act, UMTA and FPR.

In the earlier discussion on reviewability it was determined that FPR did not apply to the present case because it did not involve a Federal procurement. The regulations cannot, therefore, be used to provide standing for the plaintiff.

An examination of the DOT Enabling Act and UMTA does not disclose any attempt by Congress to protect the interests of disappointed bidders and plaintiff has not specifically pointed to any such provision. The only section which mentions competitive bidding, 49 U.S.C. § 1608(b) of UMTA, is concerned with procedures which must be used when there is no bidding. Nor do the USDOT publications provide a source of standing for a disappointed bidder who was not the low bidder. The publications are not a "relevant statute", and even if they were, they do not indicate concern for such a bidder. The Secretary must review a decision by the local authority to award a contract to a bidder other than the low bidder, but does not have to make any review when the contract is awarded to the low bidder. The regulation is intended to insure that a contract is made at a higher cost, necessitating a higher federal contribution, only when there is good cause. This is not the interest that plaintiff is seeking to protect in this suit.

It does not matter if Pullman would be "a reliable private attorney general, because it was financially injured". The interest that it represented must be one which is meant to be protected. In Association of Data Processing Service Organizations v. Camp, *supra*, and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970) the Court found Congressional intent to protect the plaintiff in the interests which they were suing to protect. In the present case no such intent can be found and, therefore, plaintiff does not have standing to sue the Secretary under 5 U.S.C. § 702.

Thus, there is no "federal question" jurisdiction in this matter. The Secretary's actions which plaintiff claims are subject to judicial review were within the discretion given by Congress and are not reviewable. Plaintiff has no standing because the interest which it represents is not within the zone of interests protected by relevant statute.

## II. *Diversity Jurisdiction*

Plaintiff asserts that there is a second ground for jurisdiction in this Court, diversity of citizenship, under 28 U.S.C. § 1332(a) which states in relevant part:

"The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000 . . . and is between—(1) citizens of different states. . . ."

This jurisdiction, if it exists, is applicable only to defendants SEPTA and NJDOT. The discussion, *supra*, has demonstrated that there is no claim against the Secretary of which this Court can take cognizance under the Federal statutes. The actions which he took were within his discretion and not reviewable. There is no claim against the Secretary upon which relief can be granted under any form of jurisdiction.

The question then becomes whether there is diversity within the meaning of the statute between plaintiff and the remaining defendants. Plaintiff is a Delaware corporation with its principal office in Illinois. SEPTA is an agency and instrumentality of the Commonwealth of Pennsylvania with its principal office in Philadelphia. Defendant Kohl is Commissioner of the Commuter Operating

Agency, an agency within NJDOT, an executive department of the State of New Jersey.

The statute requires that the parties be citizens of different states. It has long been decided that a state or its alter ego is not a citizen for purposes of diversity jurisdiction. Minnesota v. Northern Securities Co., 194 U.S. 48, 24 S.Ct. 598, 48 L.Ed. 870 (1904). The determination that an agency is the alter ego of the state is a question of federal, not state law. Harris v. Pennsylvania Turnpike Commission, 410 F.2d 1332, 1334 (3 Cir. 1969).

SEPTA was established under the Metropolitan Transportation Authorities Act of 1963, 66 Pa.Stat.Ann. § 2001 et seq. The statute authorizes the creation in each metropolitan area of a separate body politic and corporate which "shall exercise the public powers of the Commonwealth as an agency and instrumentality thereof." 66 Pa.Stat.Ann. § 2004(a). SEPTA claims that as an instrumentality and agency of the Commonwealth it is the alter ego of the Commonwealth and is not a citizen for purposes of diversity.

The proper test of whether an agency is the alter ego of the state is whether the state is the real party in interest. Krisel v. Duran, 386 F.2d 179 (2 Cir. 1967), cert. denied 390 U.S. 1042, 88 S.Ct. 1635, 20 L.Ed.2d 303 (1968). SEPTA has various powers, including the power to sue or be sued; to acquire, purchase, hold or lease property; to appoint officers, to prescribe their duties and fix their compensation; to fix, alter, charge and collect reasonable rates. 66 Pa.Stat. Ann. § 2004(d). It may borrow money and issue bonds, and under no circumstances shall any bonds or certificates issued by the authority become the indebtedness or obligation of the Commonwealth or of any political subdivision. 66 Pa.Stat.Ann. § 2010. The authority will be governed by a board which will consist of one ex-officio member appointed by the Governor and two members appointed by the county commissioners of each county, and, in any country of the

first class containing a city of the first class, by the Mayor with the approval of the city council. 66 Pa.Stat.Ann. § 2016.

A survey of the legislation authorizing the formation of SEPTA does not indicate that the authority is the alter ego of the Commonwealth. Defendants argue that the situation is analogous to the Pennsylvania Turnpike Commission which the Pennsylvania Supreme Court has held to be clothed with the sovereign immunity of the Commonwealth and its alter ego. See Rader v. Pennsylvania Turnpike Commission, 407 Pa. 609, 182 A.2d 199 (1962); cf. Commonwealth v. Merritt-Chapman & Scott Corp., 432 Pa. 584, 248 A.2d 194 (1968). The Third Circuit, however, has never repudiated its earlier decision, Gerr v. Emrick, 283 F. 2d 293 (3 Cir. 1960), which held that for diversity purposes the Commission was not the alter ego of the Commonwealth. See Harris v. Pennsylvania Turnpike Commission, 410 F.2d 1332 (3 Cir. 1969). Even if the Turnpike Commission were now judged to be the alter ego of the state, SEPTA would not be. The Turnpike Commission is drawn from residents throughout the state who are appointed by the Governor. The SEPTA board, with only one exception, is appointed by local officials and is comprised of local residents. They are concerned only with local problems. The state is not responsible for any debts incurred and most responsibilities lie with the board and not with state officials. The Act terms the authority a body corporate and its functions are proprietary rather than governmental. While none of these factors is controlling, the totality of the circumstances indicate that the Commonwealth is not the real party in interest. SEPTA is a citizen for diversity purposes.

III. *Plaintiff's standing to sue in Pennsylvania*

Defendants claim that even if SEPTA were a citizen for the purposes of diversity jurisdiction, plaintiff does not have standing to sue. They argue that plaintiff is a disappointed bidder which

may not sue to enjoin the awarding of a contract. Plaintiff asserts that it comes into court as a taxpayer which does have standing under Pennsylvania law.

■ Since this case is in Federal court on the basis of diversity of citizenship only, this Court is in effect only another court of Pennsylvania. It should assume no more and no less jurisdiction than a state court would in the same matter. "[A]ll questions of amenability to suit in diversity actions which involved no federal questions, should be resolved in accordance with state rather than federal standards." National Equipment Rental, Ltd. v. Reagin, 338 F. 2d 759, 762 (2 Cir. 1964). This Court may hear the case only if a court of Pennsylvania could hear the case. Standing of the plaintiff to sue is, therefore, determined by Pennsylvania law.

■ It is uncontroverted that a disappointed bidder does not have standing to sue in Pennsylvania to enjoin the awarding of a contract. A taxpayer, who also happens to be a disappointed bidder, may seek an injunction against the granting of a contract. Heilig Brothers Co., Inc. v. Kohler, 366 Pa. 72, 76 A.2d 613 (1950). In *Heilig* the Pennsylvania Supreme Court held that a party which had made a bid to purchase county owned property had standing to sue when it came into court as a taxpayer to seek the revocation of a sale to a party offering less. The complaint stated that the action was instituted "in its behalf and in behalf of all parties who may intervene." The deed was set aside and title was returned to the county.

The Supreme Court of Pennsylvania in R. S. Noonan, Inc. v. School District of City of York, 400 Pa. 391, 162 A.2d 623 (1960) clarified the meaning of "taxpayer" as applied to disappointed bidders. In *Noonan*, a disappointed bidder sought to have a contract awarded to him and damages paid. The Court distinguished *Heilig* which was in substance a taxpayer's suit:

"The relief sought by the plaintiff in that case was not a benefit peculiar and individual to itself . . . No personal benefit accrued to Heilig because of the Court's decision. It only shared in the benefits which accrued to the community as a result of cancelling a conveyance which had been obtained through breach of trust of public officials." 162 A.2d at 625

■ Plaintiff asserts its status as a taxpayer and claims that it is bringing this action in that capacity. The general thrust of plaintiff's action, however, would indicate that it is actually pursuing the case as a disappointed bidder. The interest which it seeks to vindicate is its own rather than that of taxpayers in general. The main indication of this is that the relief requested is the award of the contract to the plaintiff. This is not a case where the low bidder was passed over for another higher bidder and the award of the contract to the plaintiff would result in a smaller burden on the public. Clearly this is a case where the remedy sought is one which is particularly beneficial to the plaintiff in its private capacity. For these reasons, plaintiff has no standing to sue in Pennsylvania.[4]

4. Nor does it appear that plaintiff has standing to sue under New Jersey law. Many cases in that state hold that a disappointed bidder does not have standing to challenge the award of a contract to a rival bidder. Camden Plaza Parking v. Camden, 16 N.J. 150, 107 A.2d 1 (1954) ; Waszen v. Atlantic City, 1 N.J. 272, 63 A.2d 255 (1949). Plaintiff, however, relies on its incidental status as a taxpayer to provide it with standing to pursue its private interest. The New Jersey courts have demonstrated an awareness of the possible divergence in interests between a disappointed bidder which seeks to overturn an award to a low bidder and obtain it for itself, and the public which seeks to have the work done at the lowest possible price. *See* McCarty v. Boulevard Comm'rs., 91 N.J.L. 137, 106 A. 219, 221 (1918). In the absence of a clear decision on standing for such a plaintiff by the New Jersey courts, we shall accept the Pennsylvania analysis since both states do not give standing to disappointed bidders, and seek to have taxpayers' interests truly represented in a taxpayers' suit.

## IV. *Conformity of GE bid to the Specifications*

An analysis of the GE bid may bring this case into proper focus. Plaintiff seeks a preliminary injunction against and review of the award of the contracts by SEPTA and NJDOT to GE on the grounds that the GE bid did not conform to the specifications. Judicial review of municipal actions is limited to cases where there is proof of bad faith, collusion, fraud or arbitrary abuse of discretion. Weber v. City of Philadelphia, 437 Pa. 179, 262 A.2d 297 (1970); Blumenschein v. Pittsburgh Housing Authority, 379 Pa. 566, 109 A.2d 331 (1954); Commercial Cleaning Corp. v. Sullivan, 47 N.J. 539, 222 A.2d 4 (1966). It is not the courts' function to determine the wisdom of actions within administrative discretion. Goodman Appeal, 425 Pa. 23, 227 A.2d 816 (1967). A plaintiff who seeks to overturn the award of a procurement contract has a heavy burden. Hibbs v. Arensberg, 276 Pa. 24, 119 A. 727 (1923).

SEPTA and NJDOT are limited by certain rules in awarding contracts under competitive bidding procedures. In a procurement, if a contract is awarded, it must be given to the lowest responsible bidder. Pa.Stat.Ann. tit. 66, § 2028 (1963); N.J.S.A. 52:34. The bid must conform in all material ways to the specifications although slight irregularities may be waived. SEPTA Regs. § 2.-15 and § 2.16. The bidders for the contract should be in the same basic position during the bidding. SEPTA Regs. § 2.-16.

Plaintiff claims that the award of the contracts was a gross abuse of discretion by SEPTA and NJDOT. It asserts that certain procedures employed during the bidding period gave GE an unfair advantage over the other bidders which resulted in great price differentials in the bids and that the agencies disregarded the material nonconformity to the specifications of several GE proposals. Plaintiff urges the court to deny the contracts to GE since its bid was not valid, and award it to the next lowest bidder, plaintiff.

The bidding procedures in this case were intended to allow the agencies flexibility in awarding the contracts. Plans, drawings and specifications were intended only to state minimum needs in a manner to encourage competition and eliminate restrictive features which might limit acceptable offers to a relatively few bidders. *See* SEPTA Regs. § 1.11. The Invitation allowed for the submission of approved equals in many instances. *See, e. g.* Invitation, §§ 3.05 (j), 5.01(d) and (e), 5.06, 6.06(b), 7.01 (b), 7.03(e) and 9.02(c). Throughout the period before submission of the bids the technical committee [5] was available to all potential bidders in order to assist in effective bidding. The bidding contemplated the use of discretion by the expert agencies involved in awarding the contracts.

(a) *Failure of SEPTA to inform the other bidders concerning approval of DC motors in the auxiliary power system*

Plaintiff complains that the other bidders were seriously prejudiced by SEPTA's failure to adequately inform the other potential bidders that it had approved GE's proposal equal for the motor alternator. It asserts that the compound wound DC motor and the 600 volt DC blower and compressor motors system was a material change from the system in the specifications and that the price differential between the two systems caused GE to be in a superior position to those who did not know of the approval.

SEPTA and NJDOT do not deny that this was a significant change from the original specifications, but they insist that it was proper to approve the proposal as an equal and to not inform the other bidders. A provision for al-

---

5. The technical committee was composed of 22 individuals representing SEPTA, NJDOT, the City of Philadelphia, the Penn Central and Reading Railroads, and the Pennsylvania Department of Transportation.

ternates and approved equals in procurement specifications has been approved. Corcoran v. City of Philadelphia, 363 Pa. 606, 70 A.2d 621 (1950); Brener v. City of Philadelphia, 305 Pa. 182, 157 A. 466 (1931). There is no legal requirement that SEPTA inform those who submitted proposed equals of their approval prior to submission of the bids. *See* Corcoran v. City of Philadelphia, *supra*, 363 Pa. at 611–613, 70 A.2d 621.

■■ The Invitation indicated that approved equals would be permitted for the motor alternator set. § S9.02(c). GE submitted its proposal for the system to the technical committee before the submission of bids. It was thoroughly considered and was approved as equal to the requirements of the specifications. The other bidders were not informed of the approval.

SEPTA and NJDOT claim that plaintiff had sufficient notice to place it on an equal footing with GE. The specifications included the notice that proposals for approved equals would be possible for the motor. § S9.02(c). Addendum 4 indicates that DC motors were clearly within the comprehension of possible methods of providing the alternator power. Plaintiff was on notice that it could make proposals concerning this system using DC motors. Plaintiff included such motors in its own system. It was not necessary that SEPTA and NJDOT give plaintiff and the others specific notice of the GE proposal. The Invitation, § A20 and § S1.01(j), allows that a bidder desiring to use an approved equal may obtain approval before the bid date, but it does not require that this approval be transmitted to the others. This is a reasonable practice since, according to the testimony of John Vollmar, one purpose of the approved equal is to provide for maximum competition among bidders to provide new methods of performing the required function. If the proponent of this new method were required to disclose it to others prior to the award it might destroy the incentive to compete regarding anything but price, and new methods might be lost.

(b) *Discussions with GE concerning the sufficiency of the wiring tests*

Pullman claims that GE's bid did not conform to § S1.07(c) of the specifications and that SEPTA and NJDOT then engaged in improper negotiations with GE concerning § 3.3.3. of the GE bid. The Invitation required that the wiring meet certain test standards. The GE bid emphasized its recognition of the importance of good wiring practices and indicated its intention of close cooperation with the SEPTA engineer so that the insulation level would be the highest reasonably attainable. The technical committee considered this proposal ambiguous and vague. They discussed this and several other ambiguities with GE representatives on September 9, 1971. In response to a letter from SEPTA on September 13, 1971, GE gave further clarification of its position in a letter of September 14, 1971. GE promised to supply a system with the maximum insulation level that is the highest reasonably and consistently attainable. SEPTA and NJDOT were satisfied that this fulfilled the intention of the specification. The contract was executed without any alteration in § S1.07(c).

■■■ An authority which is about to award a contract may seek clarifications of an ambiguity. Corcoran v. City of Philadelphia, *supra;* Faist v. Mayor of City of Hoboken, 72 N.J.L. 361, 60 A. 1120 (1905). The technical committee determined that the GE proposal after the clarification, conformed to and did not require any change in the specifications. It believed that GE meant to bind itself to the intentions of the specification. The procedure was permissible and the determination by the committee was reasonable.

(c) *Disclaimer by GE of certain guarantee responsibilities*

Plaintiff argues that the guarantee provision of the GE bid, § 2.4, did not conform to § S1.04 of the specifications, and that SEPTA and NJDOT improper-

ly permitted GE to modify the guarantee. The GE proposal in question is essentially an explanation of its liability and it does not deny the liabilities which are contained in the specifications. GE did not object to the guarantee provisions in the contract, Articles 10 and 21, and executed the contract containing the original guarantee provisions without alteration.

### (d) *Variations from drawings in the specifications*

Plaintiff complains of several instances in which the GE bid does not conform to the drawings in the specifications. These alleged variations include (1) lack of small side windows at each end of the car, (2) a "low" ceiling in the middle of the car, (3) visible screws, (4) failure to include a stainless steel rubstrip, and (5) square corners for the sash in side doors.

These variations from the drawings in the specifications do not make the GE bid nonconforming. The Invitation, § S2.05, states that the drawings showing plans of the car "are to be used as a guide and for reference purposes only". These alleged variations concern differences in the drawings which are not binding. This provision indicates that much of the interior design will be completed after the award of the contract. The testimony of SEPTA's expert witness, John R. Vollmar, indicated that this is normal in the procurement of railroad cars.

### (e) *Safety gates*

Pullman claims that the safety gates in the GE bid did not meet the requirements of the Invitation, § S5.06. The specifications provide for "[s]afety barriers of approved design . . . which shall enclose the sides of the passageway between cars." Plaintiff asserts that the barriers proposed by GE in Figure 5.2–1 will not enclose the passageway on sharp curves and the gap between cars will be excessive. This objection would appear to be without merit since no dimensions are given in either the specifications or the GE proposal. The Invitation makes it clear that the final design must be acceptable to SEPTA.

In short, there appears to be little merit to plaintiff's claim that the award to GE was a gross abuse of discretion by SEPTA and NJDOT. Further, we find no evidence of bad faith, collusion or fraud.

### CONCLUSION

Plaintiff's complaint is founded primarily upon the contention that the GE bid, which is the lowest, is nonconforming, and that it fails to comply with the Invitation to Bidders in some 12 respects, several of which appear to concern picayune matters. The specifications in the bid documents issued on May 17, 1971, consisted of 341 pages of which 260 pages were devoted to a technical description of the performance levels required. Thereafter, 13 separate addenda were issued, prior to the receipt of bids, containing more than 50 pages and with 222 changes in the specifications including at least 185 separate changes in the technical part of the documents.

Thus, we are confronted as the Court was in *Steinthal* "with technical and complex issues of interpretation of procurement regulations." Although we do not reach the question of the merits of plaintiff's request for a preliminary injunction, the prospects appear bleak, indeed, that plaintiff will be able to make the kind of showing required to warrant judicial interference in the procurement process under the standards articulated in *Steinthal*. The entire thrust of the Court's 32-page opinion in that case is to emphasize the need for extreme caution by courts in undertaking review of a procurement process. Thus, at page 21 of the Opinion, the Court pointed out that "in subsequent decisions [following *Scanwell*] we have suggested the judicial responsibility to consider carefully and attentively the procurement circumstances of every case, with a view towards limiting the instances of unnecessary judicial intervention into the procurement process." Again, on page 22, the court stated that there were two principles "of especial importance for judicial consideration of emergency challenges to determinations of procurement officials:

(1) court should not overturn any procurement determination unless the aggrieved bidder demonstrates that there was no rational basis for the agency's decision; and (2) even in instances where such a determination is made, there is room for subsequent judicial discretion in the presence of overriding public interest considerations, to refuse to entertain declaratory or injunctive actions in a pre-procurement context." We agree with the severe limits imposed on the scope of review by Federal Courts of procurements by Federal agencies operating under Federal Procurement Regulations, and we have no doubt that Pennsylvania and New Jersey Courts are similarly reluctant to interfere. *See* Blumenschein v. Pittsburgh Housing Authority, 379 Pa. 566, 109 A.2d 331 (1954); Sierra Club v. Sanitary Water Board, 3 Pa. Cmwlth. 110, 281 A.2d 256 (1971); and William A. Carey & Co. v. Borough of Fair Lawn, 37 N.J.Super. 159, 117 A.2d 140.

This, then, is a case of a disappointed bidder seeking the contract with little prospect of prevailing ultimately on the merits. This is also the case of a plaintiff clearly lacking standing to sue. Therefore, the motion of defendants for dismissal of plaintiff's complaint is granted because of plaintiff's lack of standing to sue.