Harman Coal Company, Petitioner *v.* Commonwealth of Pennsylvania, Department of Environmental Resources and Borough of Brookville, Respondents.

Argued February 28, 1978, before President Judge BOWMAN and Judges CRUMLISH, JR., WILKINSON, JR., MENCER, ROGERS, BLATT and DISALLE.

*Joseph N. Mack,* with him *Mack and Bonya; Blair S. McMillin;* and *Reed, Smith, Shaw & McClay,* for petitioner.

*Elissa A. Parker,* Assistant Attorney General, with her *Donald J. Dennison,* and *Dennison and Mattson,* for respondents.

OPINION BY JUDGE ROGERS, April 11, 1978:

The Harman Coal Company (Harman) has filed a petition to review an order of the Pennsylvania Environmental Hearing Board (EHB) affirming the denial by the Pennsylvania Department of Environmental Resources (DER) of Harman's application for a mine drainage permit pursuant to The Clean Streams Law, Act of June 22, 1937, P.L. 1987, *as amended,* 35 P.S. §691.1 et seq.

Sometime prior to 1974, Harman leased approximately 1000 acres in Warsaw Township, Jefferson County, with the intention of operating a coal surface or strip mine. Harman submitted an application for a mine drainage permit to DER which stated that the total surface area to be affected by the proposed strip mine would be 349 acres and that the expected daily yield of coal would be approximately 200 tons. The application also stated that drainage from the mine would be into an unnamed tributary of the North Fork of Red Bank Creek.

Harman was notified by letter of the DER that its application had been denied. The stated reasons for

denial were that the low alkalinity and low buffering capacity of the watershed would make it difficult for any acid mine drainage or siltation from strip mining to be absorbed; that any acid mine drainage or siltation would have a serious deleterious effect on the water supply of the Borough of Brookville and on recreational uses of the area; and that the proposed facility would inadmissibly augment existing acid mine drainage on the site emanating from an abandoned strip cut.

Harman filed an appeal from the DER's order to the EHB and the EHB allowed the Borough of Brookville intervention. Thirteen hearings were held before EHB member Joseph L. Cohen. The EHB eventually entered its order affirming the DER's denial of Harman's application for a mine drainage permit. EHB's action was founded on evidence adduced at the hearings which established to EHB's satisfaction that if Harman's application were granted there would exist a "high probability of acid mine drainage being discharged into clean waters in contravention of The Clean Streams Law . . . and regulations thereunder. . . ." Harman filed a timely petition for review of the EHB's order in this Court. We affirm.

Section 301 of The Clean Streams Law (the Act), 35 P.S. §691.301 provides:

> No person or municipality shall place or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into any of the waters of the Commonwealth any industrial wastes, except as hereinafter provided in this act.

Section 1 of the Act, 35 P.S. §691.1, expressly includes mine drainage within the definition of industrial waste. Section 315, 35 P.S. §691.315, prohibits the operation of a mine involving any discharge or drainage into the water of the Commonwealth unless authorized

under regulations of the DER or by a permit issued by the DER. The pertinent DER regulation provides that permits may not be issued if there is any evidence that mine drainage into a clean stream will be acidic and if there is "presumptive evidence of *potential* pollution of the waters of the Commonwealth." 25 Pa. Code §99.35(a). (Emphasis added.) Applicants for permits therefore must carry the burden to prove that the drainage is not acidic and that adequate measures can and will be taken to insure that the drainage will not result in any pollution of the clean streams of the Commonwealth.

The EHB concluded that because of the physical characteristics of the site of Harman's proposed mine,

any application to strip mine in this area must provide for effective control of acid discharges after mining has been completed. Appellant's application does not demonstrate that after mining is completed no acid mine drainage will enter the waters of the Commonwealth, including the North Fork, the unnamed tributary thereof and the groundwaters in the area.

The EHB findings supporting this conclusion include the following:

41. Neither the DER nor the Borough of Brookville conducted any analysis of the overburden at the site of the proposed mining operation. The only analysis of the overburden was contained in appellant's original permit application in this matter.[1] The DER and the borough claims that the analysis performed by appellant lacks validity. They claim that the Carruccio petrographic analysis method of examining overburden and the Ranton-Hidalgo

---

[1] It should be pointed out that although Harman provided the samples of the overburden, the oxidation tests were performed by DER's chemists.

method of determining the acidic properties of the overburden (neither of which methods were employed by appellant) constitute valid tests for determining the acid producing properties of the overburden.

42. Analysis of the soils in the area of the proposed mining activity showed them to be highly acidic in character. Inasmuch as the acidic character of soils is indicative of the overburden pH of which the soils were formed, there is a strong likelihood that the overburden in the area has a high acid-producing potential.

43. Appellant's application does not contain adequate measures to prevent acid discharges from the area to be mined after mining is completed.

44. Acid discharges from the proposed mining operating after completion of such mining would in all likelihood contaminate domestic wells in the area, lower the pH of the unnamed tributary and adversely affect the quality of North Fork and its uses. (Footnote added.)

At this point we must observe some fundamentals. In strip mining, soil and overburden must be removed before the coal which lies beneath can be removed. When the mining is completed the overburden must, by present day requirements, be replaced by back filling. If the overburden is acidic, its disturbance in the strip mining operation will cause the acidic elements to drain through and over the mine site and eventually into the waters of the Commonwealth; unless, of course, the acid in the drainage can be neutralized by treatment.

Harman presents three questions for our consideration: (a) whether the EHB committed error by basing its finding of a condition of acidity on the

overburden on subjective evidence where objective scientific evidence to the contrary was available, (b) whether EHB's finding of acidic overburden was supported by substantial evidence where the evidence of an acidic condition was subjective and was contradicted by the only analysis of the overburden in the record, and (c) whether EHB's finding of a likelihood of a discharge of acid mine drainage after completion of mining was supported by substantial evidence. Harman thus complains of EHB's findings as unsupported by substantial evidence. Harman's first two propositions are inextricable and both are founded principally on the fact that prior to filing its application for permit, Harman, as the result of discussions with DER representatives, submitted samples of the overburden at its site for tests by DER chemists. The test performed by DER's chemists is called an oxidation test. It showed that the samples of overburden furnished by Harman had pH values which indicated a low acid forming potential. Harman says that this test should have been taken by DER and EHB as conclusive proof that its mining operation would not result in the pollution by acid mine drainage of the unnamed tributary of the North Fork. Harman's thesis rests on the fact that the oxidation test had been approved by DER and EHB in previous cases and that, as it asserts in its brief, DER's countervailing evidence of acid overburden on the site "was limited to casual sampling and visual analysis of surface soils, statements about the Clarion coal seam's general reputation as a high acid producer, and some evidence of acid mine drainage from an unbackfilled mine near the proposed site."[2] Our review of the extensive record convinces us, as it did the EHB, that the evidence thus minimized by Harman was in fact worthy of acceptance

---

[2] The evidence is that the "unbackfilled mine" water referred to is on, not near, the site of Harman's proposed mine.

as proof that the overburden was acidic and that it was substantial in quantity.

Extensive water quality studies conducted by DER found that the drainage from an old mine on the site of Harman's proposed mine was highly acidic. Four geologists testified for the DER that the very best test for determining the acidity of overburden is by chemical analysis of discharges from previously mined areas on the same site and that if Harman's operation were to proceed, it would cause acid mine drainage to be discharged into the North Fork of Red Bank Creek. Further, there seems to be no dispute in the testimony concerning the fact that the Clarion's coal seam produces a high acid yield.

In addition, the DER adduced the testimony of experts, one of whom supervised the work on Harman's samples, that the oxidation test made of those samples is no longer considered to be reliable.

Harman's third and final contention—that EHB's finding of a likelihood of a discharge of acid mine drainage after the completion of mining in accordance with its application is not supported by substantial evidence—is also without merit. It is true that Harman's expert witness testified that any acidity in the drainage produced by strip mining the site would be neutralized by limestone present on the site. DER, however, adduced the testimony of several qualified witnesses that the limestone on the site was thin, discontinuous, impure, and not present in quantity sufficient to buffer the acidity which would be discharged by Harman's proposed strip mine.

In addition to the evidence hereinbefore commented upon, we note that the DER adduced extensive testimony which tended to show that the disturbance of the overburden would significantly increase the amount of ground water contribution (as distinguished from surface water) to the flow of the unnamed tributary;

that pH tests of the soil (a condition of soil being an indication of the condition of overburden) on the site produced acidic results; that a fault existed at the site which would cause any acid drainage to reach and pollute domestic wells in the vicinity; and that both the unnamed tributary and the North Fork have inconsistent water quality with low buffering ability and consequent low resistance to acid drainage.

In asking us to overturn the EHB's finding as unscientific and for this reason unsubstantial, Harman would have this Court substitute its discretion as to the quality of the evidence for that of the EHB. This would require more temerity than we have or should have. The members of the EHB and its staff workers have an expertise in the scientific and technical aspects of environmental protection not possessed by this Court. We will be especially wary of disturbing their findings in matters clearly within their special knowledge and competence. *Commonwealth v. Harmar Coal Co.*, 452 Pa. 77, 100, 306 A.2d 308, 320-21 (1973); *Department of Environmental Resources v. Precision Tube Co., Inc.*, 24 Pa. Commonwealth Ct. 647, 358 A.2d 137 (1976); *East Pennsboro Township Authority v. Department of Environmental Resources*, 18 Pa. Commonwealth Ct. 58, 334 A.2d 798 (1975); *Sierra Club v. Sanitary Water Board*, 3 Pa. Commonwealth Ct. 110, 281 A.2d 256 (1971). Our review of the record in this case (which we have only briefly summarized above) convinces us that the findings of fact made by the EHB are supported by substantial evidence.

Harman makes an additional argument which merits brief mention. It suggests as a reason why DER's evidence should have been rejected that its principal expert witness was not qualified by education and experience to give opinion evidence. It is a question for the discretion of the trier of facts whether a wit-

618

ness has shown himself sufficiently qualified to testify, and his ruling will not be reversed except in a case of clear error. *May Department Stores Company v. Allegheny County Board of Property Assessment*, 441 Pa. 556, 272 A.2d 862 (1971). We have reviewed the qualifications of the witness Harman refers to, which include a baccalaureate degree and extensive study toward a master's degree and considerable work experience in relevant fields, and have concluded that EHB did not commit error in admitting his testimony.

The order of the EHB is affirmed.

ORDER

AND Now, this 11th day of April, 1978, the order of the Environmental Hearing Board dated January 3, 1977 affirming the denial by the Department of Environmental Resources of a mine drainage permit to the Harman Coal Company is affirmed.