Peter VANKO, Plaintiff,

v.

Dale R. FINLEY et al., Defendants.

No. C76–1305.

United States District Court,
N. D. Ohio, E. D.

June 1, 1977 and Sept. 28, 1977.

Lewis Einbund, Selker, Einbund, Rubenstein & Mosher, Jeffrey H. Friedman, Cleveland, Ohio, for plaintiff.

Arthur R. Fitzgerald, John W. Kellogg, Thomas W. Gray, and Michael M. Courtney, Asst. Gen. Counsel, The Greater Cleveland Regional Transit Authority, Cleveland, Ohio, Robert W. Batchelder, Arthur R. Silen, and Glenn F. Wasserman, Urban Mass Transp. Admin., Washington, D. C., William D. Beyer and Donald Weisberger, Asst. U. S. Attys., Cleveland, Ohio, for defendants.

## MEMORANDUM AND ORDER

WILLIAM K. THOMAS, District Judge.

Plaintiff Peter Vanko filed this action on December 14, 1976 against defendant board members of Cuyahoga County's Regional Transit Authority (hereinafter referred to as "RTA"), then Secretary of Transportation William T. Coleman, Jr., and Robert Patricelli, Administrator of the United States Urban Mass Transportation Administration. Vanko seeks to bring the action both on his own behalf and as representative of the class of "mobility handicapped" individuals within Cuyahoga County. His complaint asks for declaratory and injunctive relief and alleges that the defendants have denied him and other similarly situated individuals access to transportation facilities provided by the RTA in violation of Section 16(a) of the Urban Mass Transportation Act of 1964, 49 U.S.C. § 1612(a); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; the Department of Transportation and Related Agencies Appropriations Act of 1975, Pub.L. No. 93–391, 88 Stat. 769 (1974); and the Fifth and Fourteenth Amendments to, and commerce clause of, the United States Constitution. The complaint premises jurisdiction upon 28 U.S.C. §§ 1331, 1337, 1343 and 5 U.S.C. § 702.

The affidavit of plaintiff Vanko states that he is confined to a wheelchair due to a birth defect and is employed by the J & B Stamping Company of Brooklyn, Ohio. Although this company is accessible by public transportation, because of his confinement to a wheelchair Vanko cannot utilize the public transit which RTA provides. .

In his prayer for relief, plaintiff asks this court to enter a preliminary injunction enjoining the defendants from taking any action toward the purchase of any mass transit vehicles; to issue a declaratory judgment that the Regional Transit Authority is currently being operated in violation of federal statutory and constitutional provisions; to permanently enjoin defendant RTA board members from operating the RTA in a manner which does not assure effective utilization of the system by the mobility handicapped; and to permanently enjoin defendants Coleman and Patricelli from releasing federal funds to RTA until the system is operated so as to provide for effective utilization by the handicapped. The

injunctive prayers for relief are specifically aimed at preventing the release of federal funds to RTA under the terms of a July 28, 1976 RTA application to the Urban Mass Transit Administration for federal financial assistance. This application requests federal funds of $99,547,200 as part of a capital improvements plan totaling $124,434,000.

Both the defendant board members of the RTA (hereinafter the "local defendants") and Secretary Coleman and Administrator Patricelli (hereinafter the "federal defendants") have moved to dismiss the complaint or, in the alternative, for summary judgment, and plaintiff has submitted a brief in opposition to these motions. The motions will now be considered and will be treated as motions for summary judgment, since matters outside the pleadings have been submitted to, and considered by, the court in ruling on the motions.

### I.

Neither set of defendants have challenged plaintiff's authority to bring this lawsuit. The court at the outset finds that the plaintiff, Peter Vanko, has standing to bring this action pursuant to Section Ten of the Administrative Procedure Act, 5 U.S.C. § 702, *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Bartels v. Biernat*, 405 F.Supp. 1012 (E.D. Wis.1975), and that he also has an implied right of action under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. *Lloyd v. Regional Transit Authority*, 548 F.2d 1277 (7th Cir. 1977). The court, therefore, need not, at this point, decide whether plaintiff can maintain a private right of action based upon the other statutes and constitutional provisions relied upon in the complaint.

■ Although the defendants do not challenge plaintiff's authority to bring this action, the local defendants contend that the court is precluded from entertaining this lawsuit at this time because of the doctrine of primary jurisdiction. This defense was originally based on the theory that the federal government had not yet acted upon RTA's grant application and that the completion of federal administrative action is a prerequisite to judicial consideration of this lawsuit. The court has been informed by Mr. Arthur Fitzgerald, Chief Assistant General Counsel of RTA, that federal approval of at least a portion of RTA's grant application has been obtained since the briefing of the motion at issue.[1] Since the Urban Mass Transportation Administration has acted on the RTA request for federal funding for purchases of additional rolling stock (disagreement over such purchases being the crux of the parties' dispute in this lawsuit), the court concludes that it has jurisdiction to entertain the action at this time. *See also Lloyd v. Regional Transportation Authority, supra*, at 1287.

■ A second procedural defense raised by the local defendants is that the plaintiff has failed to join the Regional Transit Authority as a party defendant and that the RTA is an indispensable party for the purposes of Rule 19 of the Federal Rules of Civil Procedure. The court agrees with these defendants that the RTA as a corporate body should be joined as a defendant to this lawsuit. This does not mean, as the local defendants argue, that plaintiff's lawsuit must be dismissed for failure to sue RTA. The court instead orders, pursuant to Rule 19(a), that the RTA in its corporate capacity be joined as a party defendant.

■ The final procedural objection the local defendants raise to plaintiff's complaint is that the RTA board members are named as defendants in both their official and individual capacities, while the facts asserted in, and prayer for relief of, the complaint concern only actions of the RTA and its board members in their official ca-

---

1. According to Mr. Fitzgerald, the federal government approved a grant of $55,108,280 to RTA on January 12, 1977. This approval included federal financing for the purchase of one-hundred and sixty-five buses, thirty special vehicles for the handicapped and elderly, and seventy-five heavy and light rapid transit cars. The remainder of the $99,547,200 request has not been acted upon, pending the completion of engineering studies.

pacities. Since this is the case, and since the relief sought is solely equitable and of a character which only the corporate body of the RTA can furnish, the complaint is ordered dismissed as against the RTA board members in their individual (but not official) capacities.

## II.

### A.

The non-procedural aspects of defendants' motions for summary judgment will now be considered. Plaintiff's first claim for relief is premised upon the Urban Mass Transportation Act of 1964, 49 U.S.C. § 1601, et seq., and, more specifically, upon Section 16(a) of that act, 49 U.S.C. § 1612(a), which provides:

(a) It is hereby declared to be the national policy that elderly and handicapped persons have the same right as other persons to utilize mass transportation facilities and services; that special efforts shall be made in the planning and design of mass transportation facilities and services so that the availability to elderly and handicapped persons of mass transportation which they can effectively utilize will be assured; and that all Federal programs offering assistance in the field of mass transportation (including the programs under this chapter) should contain provisions implementing this policy.

Plaintiff contends that the "special efforts" mandated by this section require the defendants "to act so as to ensure that all transit rolling stock and facilities can be effectively utilized by all mobile disabled

and elderly people." The defendants' position is that neither the Urban Mass Transportation Act nor the other statutory or constitutional provisions relied upon by plaintiff require "that every regular route vehicle must be accessible to every person with a mobility handicap, including those who must ambulate by wheelchair". The defendants instead contend that they have met the act's requirement of "special efforts" by the institution of several programs and policies designed to benefit the handicapped and elderly, such programs being collectively entitled Community Responsive Transportation (CRT).

■ This court cannot accept plaintiff's broad reading of 49 U.S.C. § 1612. To the contrary, the court specifically rejects plaintiff's contention that this statutory provision requires that "all transit rolling stock and facilities [must be able to be] effectively utilized by all mobile disabled and elderly people."[2] *Leary v. Crapsey*, Civil No. 76–286 (W.D.N.Y. Mar. 31, 1977); *Young v. Coleman*, Civil No. H–76–201 (D.Conn. Dec. 17, 1976); *United Handicapped Federation v. Andre*, 409 F.Supp. 1297 (D.Minn.1976); *Snowden v. Birmingham—Jefferson County Transit Authority*, 407 F.Supp. 394 (N.D. Ala.1975), aff'd (5th Cir. April 21, 1977); *Bohlke v. Golden Gate Bridge, Highway, and Transportation District*, No. 73362 (Marin County, California Superior Court, May 9, 1975). In establishing a national policy to guarantee mass transit utilization rights for the handicapped, Congress did not create immediate rights of access for all handicapped individuals to all mass transit facilities.[3]

---

**2.** On May 19, 1977 Secretary of Transportation Brock Adams ordered that all buses bought with Department of Transportation funds after September 30, 1979 must conform to the Department's "Transbus" prototype specifications. One of these specifications requires a ramp suitable for wheelchair boarding. Buses of such design are not now commercially available and the court therefore finds that the Secretary's decision has no direct bearing on this case. See May 19, 1977 Decision of Brock Adams, Secretary of Transportation, to Mandate Transbus.

**3.** Although such universal accessibility was undoubtedly the goal of the 1970 Urban Mass Transportation Act amendment, Congress was certainly cognizant of the technological and economic problems which immediate requirement of universal accessibility would create. See 41 Fed.Reg. 18236 (April 30, 1976) (wherein it is stated that "no manufacturer of full-size transit buses presently offers a lift or a ramp option for its buses . . ."); May 19, 1977 Decision of Brock Adams, *supra*, pp. 7–8 (wherein the Secretary found it will be three and one-half years before deliveries of the ramp-equipped Transbus can begin). Congress's mandate that mass transit systems un-

The plaintiff has left uncontroverted RTA's estimate that a fully accessible transit system would require $66,800,000 in capital expenditures and an additional $10,880,000 per year in increased operating expenses (the total cost of operation of RTA's bus and rapid transit systems in 1976 was $40,150,000).[4] Expenditures of this magnitude for an estimated 1,700 to 8,600 persons confined to wheelchairs are not required by Section 16(a) of the Urban Mass Transportation Act, when, as in this case, adequate transit services for all persons in Cuyahoga County can apparently be provided at a fraction of such cost.[5] Although the court is cognizant of the psychological and rehabilitative benefits to be gained from integrating wheelchair users into the regular transit system, the Regional Transit Authority is only required to provide mass transit that the handicapped and elderly can "effectively utilize." The court therefore holds that there is no statutory infirmity in RTA's basic approach to Section 16(a) special efforts compliance (the operation of a separate paratransport system parallel to the main bus and rapid systems).[6]

dertake "special efforts" for the elderly and handicapped is therefore a dynamic, rather than a static, requirement, the specific contours of which can only be defined by the state of mass transportation technology at any particular moment. Since the plaintiff has not rebutted the defendants' showing of the economic infeasibility of universal access (and has not cited the court to any evidence that a universally accessible transit vehicle is currently technologically feasible), Section 16(a) of the Urban Mass Transportation Act does not now, in 1977, require universal accessibility.

The Secretary of Transportation recently addressed the question of the DOT's accessibility policy prior to September 30, 1979 (after which date all buses must conform to DOT's "Transbus" prototype and contain wheelchair accessibility ramps):

.  .  .  I believe it appropriate to allow local governments to decide how best to serve their elderly and handicapped populations until Transbus is ready for production. Those who purchase lift-equipped buses will thereby offer substantially enhanced accessibility to their elderly and handicapped citizens. Those offering special services will provide valuable experience for the period after Transbus is introduced since even fully accessible fixed route buses will not meet the transportation needs of all elderly and handicapped.

May 19, 1977 Decision of Brock Adams, *supra*.

The court notes that much of the legislative history cited by plaintiff is not inconsistent with this footnote's interpretation of 49 U.S.C. § 1612(a): an interpretation of "special efforts" that requires integration of many of the nation's mobility handicapped into mass transit systems at once, and eventual integration of wheelchair users into these systems when technology permits.

4. These figures are taken from the June 2, 1976 statement of Leonard Ronis, RTA's general manager, to the House Public Works Committee, which is Attachment D to Appendix E of the federal defendants' brief. Mr. Ronis also told the House Committee that RTA estimates there are approximately 1,700 potential transit users confined to wheelchairs in the Cleveland area, of whom 200 to 250 would probably utilize a fully accessible RTA on a daily basis. Attachment C to Appendix E refers to the Harvard Report on Community Responsive Transit which estimated that 8,600 persons confined to wheelchairs might use a specialized transit system for the handicapped (this estimate, however, was based on national averages rather than a local population analysis). Even taking the Harvard figures on potential users, the additional cost of total accessability would be $1,265 per year per potential user and $7,767 per user for the required capital outlay. If RTA's own figures on estimated actual (rather than potential) users are accepted, the costs per user soar to $43,520 to $54,400 per year and $267,200 to $334,000 in capital expenditures.

Defendants further point out in their briefs that wheelchair users might not be able to take advantage of a fully accessible bus system during the winter months when snow covers Cuyahoga County sidewalks and streets. Any such problems in getting from one's home to the bus are minimized by CRT's door-to-door service.

5. Assuming that RTA has a limited amount of money with which to work, expenditures of the magnitude necessary to create a fully accessible transit system not only mean that there will be less money for the general transit system, but also that RTA will not be able to provide as complete services as it might otherwise be able to for the elderly and handicapped who are not confined to wheelchairs. Such possible conflicts of interest among the mobility handicapped must, of course, be addressed by this court in any eventual consideration of Peter Vanko's request for class certification of his lawsuit.

6. Although defendants are not on this record required to make all RTA buses accessible to wheelchair users, any new buses ordered will be accessible to most other elderly and handi-

### B.

Although the court rejects plaintiff's argument that the Urban Mass Transportation Act of 1964 requires that all rapid transit vehicles must be universally accessible, it nevertheless feels that on the present record summary judgment for the defendants is inappropriate. However, as hereafter explained, the court reserves final ruling on the defendants' motions pending augmentation of the record and submission of supplemental briefs. Two issues left unresolved on this record are whether the RTA is required by the applicable federal statutes to provide service for elderly and handicapped individuals "that is reasonable by comparison with the service provided to the general public"[7] and whether, if it is required to provide comparable service, it is in fact meeting such requirement.[8] The briefs submitted to this court, as well as all of the cases cited to the court, focus on the question of whether or not RTA must make all of its vehicles fully accessible and have not considered in any depth the extent to which federal statutes may require comparable, but non-integrated, transit services for the wheelchair confined and other handicapped and elderly individuals. The court, therefore, orders the parties to submit to the court supplemental briefs on this legal issue, as well as any affidavits or other documentation that bears on the comparability of services provided by RTA's Community Responsive Transit and RTA's general transit services. Such information should include current data on the coverage of CRT both in terms of the area in which the program is in effect and the hours and days per week of its operation.[9] These further submissions should be made to the court within twenty days from the date of this memorandum and order.

### C.

Plaintiff has also claimed relief against local and federal defendants under the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq., the Department of Transportation and Related Agencies Act of 1975, Pub.L. No. 93–391, 88 Stat. 768 (1974), and the commerce, due process, equal protection, and privileges and immunities clauses of the United States Constitution. Since ruling is reserved on the defendants' motions for summary judgment, it is unnecessary to discuss plaintiff's claims under these other statutory and constitutional claims at length. The separate provisions will now be considered briefly, however.

The Rehabilitation Act claim of plaintiff is based upon 29 U.S.C. § 794, which provides that:

No otherwise qualified handicapped individual in the United States, as defined in section 706(6) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

■ As to this statutory claim, the court adopts the reasoning of Part II.B. of this opinion and finds that the same issue remains unresolved under the Rehabilitation Act of 1973 as under the Urban Mass Transportation Act of 1964: i. e., whether RTA is required to provide services for the elderly and handicapped which are reasonably comparable to the services provided the general public and, if such a requirement exists, whether RTA is in compliance with it. The court, however, specifically

---

capped persons who are not confined to wheelchairs. See 49 C.F.R. § 609.15.

**7.** This quotation is taken from the definition of Section 16(a) "special efforts" contained in the appendix to the Urban Mass Transportation Planning regulations implementing the 1964 Urban Mass Transportation Act. 41 Fed.Reg. 18236 (April 30, 1976).

**8.** The parties are also requested to address the issue of what this court's scope of review

should be if it determines that comparability is required between mass transit services for the handicapped and the general public. *See e. g., Kendler v. Wirtz,* 388 F.2d 381 (3d Cir. 1968); *Pullman Incorporated v. Volpe,* 337 F.Supp. 432 (E.D.Pa.1971).

**9.** The parties should also try to assess CRT in light of the examples of "special efforts" programs contained in the appendix to 49 C.F.R. § 613.204.

rejects the plaintiff's contention that the Rehabilitation Act of 1973 or the regulations promulgated thereunder [10] require the defendants to make all RTA buses accessible to wheelchairs.[11]

■ Plaintiff's third claim for relief is based upon the Department of Transportation and Related Agencies Act of 1975, Pub.L. No. 93–391, 88 Stat. 768 (1974), Section 315 of which provides:

> SEC. 315. None of the funds provided under this Act shall be available for the purchase of passenger rail or subway cars, for the purchase of motor buses or for the construction of related facilities unless such cars, buses and facilities are designed to meet the mass transportation needs of the elderly and the handicapped.

This section of the appropriations bill is of no benefit to plaintiff, however, since it only restricts the allocation of funds under that particular allocations act. In this 1974 act, Congress only appropriated money for the fiscal year ending June 30, 1975 and thus RTA cannot now receive funds from this 1974–75 appropriation.[12] Thus, defendants are not in violation of Pub.L. No. 93–

391, and plaintiff's claim, insofar as it is based on this act, is ordered dismissed.

Since the enactment of this 1974 legislation, Congress has passed two other appropriations acts to fund the Department of Transportation for the fiscal years ending June 30, 1976 and June 30, 1977. Pub.L. No. 94–134, 89 Stat. 695 (1975); Pub.L. No. 94–387, 90 Stat. 1171 (1976). Neither of these acts have language similar to the 1974–75 appropriations bills, and thus they too are of no help to plaintiff.[13]

■ Plaintiff's fourth and final claim for relief is constitutional in nature, based upon the due process and equal protection clauses of the Fifth and Fourteenth Amendments to the United States Constitution, the privileges and immunities clause of the Fourteenth Amendment to the Constitution, and the Constitution's commerce clause. These constitutional provisions are held to add nothing to the plaintiff's cause of action. The mandate of "special efforts" imposed upon defendants by statute is a higher standard than any which these constitutional provisions might require.[14] Any protection

---

**10.** These include regulations promulgated by H.E.W., 42 Fed.Reg. 22675 (May 4, 1977) (which are inapplicable in this case, but instructive) and the UMTA regulations promulgated upon the authority of both the Rehabilitation Act of 1973 and the Urban Mass Transportation Act, 49 C.F.R. § 609.1 et seq.

**11.** Both sets of defendants have cited *Young v. Coleman, supra,* to support their contention that the Rehabilitation Act of 1973 does not require all buses to be wheelchair accessible. Their briefs specifically quote that opinion's citation of 29 U.S.C. § 792(c)(1)(A), which is also a part of the 1973 Rehabilitation Act:

> "The [Transportation Barriers Compliance Board] shall also . . . determine how and to what extent transportation barriers impede the mobility of handicapped individuals and aged handicapped individuals and *consider ways in which travel expenses in connection with transportation to and from work for handicapped individuals can be met or subsidized when such individuals are unable to use mass transit systems* . . . (Emphasis added)."

The court agrees with the defendants that this provision is evidence that Congress did not intend the Rehabilitation Act to require that all handicapped individuals be fully integrated into main-stream mass transit systems. The court

notes, however, the Rehabilitation Act Congress's interest in providing adequate transportation for gainfully employed handicapped individuals.

**12.** Plaintiff nowhere contends in his complaint, briefs, or affidavit that the funds in question stem from this 1974–75 appropriations bill.

**13.** The only mentions of the handicapped and elderly in these most recent bills require as a condition for mass transit grants that the grant recipient establish special fare structures for these groups (RTA is in compliance with these requirements). 90 Stat. 1171, 1186 (§ 315), 89 Stat. 695, 711 (§ 314). Thus the deletion of the broad language of the 1974 legislation in the 1975 and 1976 appropriations bills stemmed not from mere inadvertence but was a conscious decision on the part of a Congress which decided to deal with the problems of the handicapped and elderly in a less sweeping, more focused, manner.

**14.** Mr. Justice Brennan has written in a plurality opinion that physical disability is not a suspect classification for equal protection purposes. *Frontiero v. Richardson,* 411 U.S. 677, 686, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (dictum).

which these constitutional provisions might provide are satisfied by RTA's Community Responsive Transit efforts for the elderly and handicapped as they are described in the pleadings, briefs, and affidavits filed with the court. *Leary v. Crapsey, supra; Young v. Coleman, supra; United Handicapped Federation v. Andre, supra; Snowden v. Birmingham-Jefferson County Transit Authority, supra; Bohlke v. Golden Gate Bridge, Highway and Transportation District, supra.* As the Supreme Court has said in another context:

> We do not denigrate the importance of decent, safe, and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill . . . Absent constitutional mandate, the assurance of adequate housing and the definition of landlord-tenant relationships are legislative, not judicial, functions.

*Lindsey v. Normet,* 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36 (1972). For the plaintiff to prevail he must, therefore, succeed on the statutory, rather than constitutional, bases of his complaint.

In accordance with the above opinion, decision on the defendants' motions is reserved pending further briefing and augmentation of the record.

IT IS SO ORDERED.

## ON MOTIONS FOR SUMMARY JUDGMENT

In a memorandum and order dated June 1, 1977, this court reserved ruling on the defendants' motions to dismiss or for summary judgment pending further briefing and augmentation of the record. The parties have submitted the additional briefs and documentary evidence requested by the court, and on the basis of this additional material, defendants' motions, treated as motions for summary judgment, are now granted.

The factual and jurisdictional posture of this case are detailed in the court's June 1, 1977 memorandum and order. In brief summary, the plaintiff, Peter Vanko, alleges that the federal[1] and local defendants[2] have denied him and other similarly situated "mobility handicapped" individuals within Cuyahoga County access to transportation facilities provided by the Greater Cleveland Regional Transit Authority ("RTA") in violation of various federal statutory and constitutional provisions. In its June 1 order, the court rejected plaintiff's claims based upon the Department of Transportation and Related Agencies Appropriations Act of 1975, Pub.L. No. 93–391, 88 Stat. 768 (1974) and various constitutional provisions. The court also rejected plaintiff's argument that either section 16(a) of the Urban Mass Transportation Act of 1964, 49 U.S.C. § 1612(a) or section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 require that "all transit rolling stock and facilities [must be able to be] effectively utilized by all mobile disabled and elderly people."[3]

Despite the fact that the court rejected any requirement that all RTA rolling stock must be "totally accessible", it nevertheless refused to grant judgment at that time for the defendants. The court instead posed three questions to the parties for further briefing and augmentation of the record:

1. The federal defendants named in the complaint are former Secretary of Transportation William T. Coleman, Jr. and Robert Patricelli, the former administrator of the United States Urban Mass Transportation Administration, and their successors in office.

2. The local defendants sued by plaintiff are the members of RTA's board of directors.

3. Despite this ruling by the court, the plaintiff still argues in his supplemental brief that all new rolling stock purchased by RTA must be totally accessible to the mobility handicapped. The court therefore reaffirms its holding that no provision of the Constitution, the applicable statutes, or the regulations of any federal department or agency require total accessibility at this time. In his May 19, 1977 order, Secretary of Transportation Brock Adams rejected any requirement of immediate conformity with the "Transbus" prototype specifications, since such fully-accessible buses are at the present time commercially unavailable. *See* n. 2 of this court's June 1, 1977 memorandum and order.

1. Do the applicable federal statutory provisions (49 U.S.C. § 1612(a) and 29 U.S.C. § 794) require that RTA provide service for the elderly and handicapped "that is reasonable by comparison with the service provided to the general public?"

2. What should the scope of this court's review be if it determines that some form of comparability is required between mass transit services for the handicapped and the general public?

3. If such comparability is required, is the RTA in fact meeting such requirement?

The questions will now be considered.[4]

### A.

The formulation of this court's first question in terms of whether transit service for the handicapped and the elderly must be "reasonable by comparison with the service provided to the general public" stems from the joint Federal Highway Administration and Urban Mass Transportation Administration regulations on urban transportation planning assistance and standards. Appendix B to 23 C.F.R. § 450, Subpart A. The federal defendants are correct, however, that this language must be read in the context of the appendix's complete definition of the "special efforts" for the handicapped and elderly which 49 U.S.C. § 1612(a) requires.[5] This definition is set forth in the fourth section of Appendix B:

4. *Special efforts, urban transportation planning process.* The urban transportation planning process must include special efforts to plan public mass transportation facilities and service that can effectively

be utilized by elderly and handicapped persons. As used in this guidance, the term "special efforts" refers both to service for elderly and handicapped persons in general and specifically to service for wheelchair users and semi-ambulatory persons. With regard to transportation for wheelchair users and others who cannot negotiate steps, "special efforts" in planning means genuine, good-faith progress in planning service for wheelchair users and semi-ambulatory handicapped persons that is reasonable by comparison with the service provided to the general public and that meets a significant fraction of the actual transportation needs of such persons within a reasonable time period. Particular attention should be given to those handicapped persons who are employed or for whom the lack of adequate transportation constitutes the major barrier to employment or job training.

The UMTA's own regulations neither require total accessibility to mass transportation facilities for the elderly and handicapped, nor do they require even immediately comparable service for this group of people. Appendix B instead speaks of "genuine, good-faith *progress*" in attaining comparability. The court concludes and determines, as the federal defendants argue, that the UMTA's definition of section 16(a)'s requirement of "special efforts" contemplates "an orderly, planned process by which steps will be taken to establish transportation service for wheelchair users and other semiambulatory persons that is rea-

---

**4.** The June 21, 1977 vacation and remand by the Eighth Circuit Court of Appeals of *United Handicapped Federation v. Andre*, 409 F.Supp. 1297 (D.Minn.1976) adds further support to the court's decision to put these questions to the parties in this case. This court reads the *Andre* remand to require a factual analysis of local transportation programs for the mobility handicapped in light of the applicable federal regulations, a factual analysis similar to that undertaken in this opinion.

**5.** 49 U.S.C. § 1612(a) itself provides:

It is hereby declared to be the national policy that elderly and handicapped persons have the same right as other persons to utilize mass transportation facilities and services; that special efforts shall be made in the planning and design of mass transportation facilities and services so that the availability to elderly and handicapped persons of mass transportation which they can effectively utilize will be assured; and that all Federal programs offering assistance in the field of mass transportation (including the programs under this chapter) should contain provisions implementing this policy.

sonable by comparison with the service provided to the general public." [6]

This court's interpretation of the UMTA regulation and of the requirement of 49 U.S.C. § 1612(a) is the same as that reached by the only court to date which has decided a section 16(a) suit against the governmental defendants on the merits. *Bartels v. Biernat,* 427 F.Supp. 226, 233 (E.D.Wis. 1977):

> The regulations do not require a full and immediate solution to the problem. What they do require is that the planning process show that special efforts are being taken to ensure that the mobility handicapped will be provided with services equivalent to the rest of the community.

See also *Young v. Coleman,* Civil No. H–76–201 (D.Conn. Dec. 17, 1976).

The court also concludes that section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, does not require the immediate establishment of services comparable to those provided the general public. Instead, this section's prohibition of discrimination against the handicapped can be satisfied by the same substantial good faith progress in both the planning and implementation of transit programs for the mobility handicapped that is sufficient for the purposes of the Urban Mass Transportation Act of 1964 and the regulations thereunder. Vague plans for the indefinite future and second-rate transit for the mobility handicapped will not satisfy the mandate of these federal laws, but instantaneous conversion to a transportation system that is comparable in every minute detail is not required either. The answer to the first question posed by the court is therefore that comparability is, in fact, required by applicable federal law, but that local transit authorities have an interim time period in which to design, plan for, and effectuate such a comparable system of mass transit for the mobility handicapped.

## B.

The second question posed by this court in its June 1 memorandum and opinion can be answered briefly. The scope of review that this court must apply to the federal actions challenged in this case is found in section 706 of the Administrative Procedure Act, 5 U.S.C. § 706. 5 U.S.C. § 706(2)(A) provides that this court shall "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." The Supreme Court has said of review under section 706(2)(A) that:

> Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). *See also Kendler v. Wirtz,* 388 F.2d 381 (3d Cir. 1968) and *Pullman, Inc. v. Volpe,* 337 F.Supp. 432 (E.D.Pa. 1971) for examples of the limited judicial review over decisions challenged under sections of the Urban Mass Transportation Act other than section 16(a).

Plaintiff challenges not only the UMTA grant to RTA as being "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," but also contends that the UMTA regulations under which this grant was approved are themselves "not in accordance with law" since they do not require immediate comparability or total accessibility. The legality of the UMTA approval of RTA's grant application will be considered in part C of this opinion. The validity of the UMTA regulations themselves, however, has already been articulated in the court's memorandum of June 1 and in part A of this opinion, wherein it was found that the Urban Mass Transportation Act of 1964 and the Rehabilitation Act of 1973 do not require either immediate comparability or total accessibility. The challenged regulations are therefore

---

**6.** This "orderly, planned process" toward the establishment of mass transit comparability is detailed in 49 C.F.R. § 613.204 and the appendix thereto.

"in accordance with law," since they require no less than do the statutes upon which they are based.[7]

## C.

█ In order to determine whether RTA is meeting its obligation to undertake "special efforts" for the provision of effective mass transit facilities for the mobility handicapped, it is necessary to set forth exactly what services RTA is now providing for the handicapped and what services it plans to provide in the near future. RTA calls these special services Community Responsive Transit (CRT). The Community Responsive Transit program is best summarized in the federal defendants' brief:

The separate system being developed by RTA [CRT] is designed to meet the needs of all elderly and handicapped persons in the service area. There will be two types of service: one which will operate county-wide during peak-hours and which will enable those whose handicaps keep them from using regular transit services to reach destinations relating to employment, education, therapy, etc.; and one operating from 9:00 a. m. to 5:00 p. m. during weekdays and from 8:30 a. m. to 3:00 p. m. on Sundays serving the intracommunity needs of the elderly and handicapped (i. e., shopping, medical visits, social visits, clubs and other activities). Both types of service will operate door-to-door, providing passengers with personalized, comfortable and secure means of meeting their transportation needs. No fares will be charged during off-peak hours, and only half-fares will be charged during peak hours.

The 9:00 a. m. to 5:00 p. m. intracommunity service was discussed in the original briefs filed in this case and is currently in effect throughout Cuyahoga County. "Extra Lift," the county-wide peak-hour service for the severely handicapped (primarily the wheelchair confined) has not yet been implemented and was not fully described in the earlier submissions of the defendants. RTA plans to inaugurate Extra Lift this fall when fifteen lift-equipped compact buses are delivered to it.[8] A draft of the Transportation Improvement Program for Northeastern Ohio, submitted as an appendix to the brief of the federal defendants, shows that RTA anticipates federal funding to purchase ninety-eight compact buses (forty-three of which will be lift-equipped) over the next five fiscal years. These buses are in addition to the thirty-four vehicles currently in CRT service and the thirty vehicles which are slated for CRT service in the UMTA grant at issue in this suit. In addition to this rolling stock, RTA anticipates spending additional funds on other capital items for the CRT program and estimates that the first year's operation of the intracommunity aspect of CRT will cost approximately one million dollars while Extra Lift will cost an additional $500,000 in operating expenses for its first year of service.

Since the Extra Lift program will not have its full complement of lift-equipped buses until fiscal year 1982, priorities have been established by RTA to determine the ridership under this program. The priorities for trip purpose are, in descending order of priority, trips to work, to college or vocational training, to other training, and, finally, trips for other purposes.[9] Priority

---

7. *See also* the Supreme Court's statement in *Phelps Dodge Corp. v. National Labor Relations Board*, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941) regarding the judicial deference due another administrative agency:

Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy.

8. These fifteen buses will be financed by an appropriation contained in the UMTA grant to RTA which is challenged in this lawsuit.

9. The high priority given to work and training trips is in conformity with the requirement in part four of Appendix B to 23 C.F.R. § 450 which provides that in establishing transit services for the mobility handicapped "[p]articular attention should be given to those handicapped persons who are employed or for whom the lack of adequate transportation constitutes the major barrier to employment or job training."

is also given to the wheelchair confined and for regularly scheduled trips for at least a three-month period. As with the intracommunity aspect of CRT, Extra Lift service will be from curb to curb, although passengers will be charged one-half of the regular RTA fare (12½ cents per one-way trip), while the intracommunity service is free. The RTA is currently accepting applications for participation in the Extra Lift program, in anticipation of the arrival of the lift-equipped buses with which service will be commenced.

In its regulations defining the "special efforts" requirement of section 16(a) of the Urban Mass Transportation Act of 1964, the UMTA has included several examples of "a level of effort that will be deemed to satisfy this requirement [of special efforts] with respect to wheelchair users and semiambulatory persons." [10] Although these examples "are not regulatory standards or minimums", they are indicative of levels and types of effort which the UMTA will accept in satisfaction of the mandate of section 16(a), and the court in its June 1 opinion therefore requested the parties to assess

RTA's efforts in light of these examples. The court concludes, on the basis of the evidence and briefs submitted by the parties, that the CRT program meets both the UMTA's first and third examples of satisfactory special efforts. [11]

The first example in the UMTA Appendix defines satisfactory special efforts in terms of "[a] program for wheelchair users and semiambulatory handicapped persons that will involve the expenditure of an average annual dollar amount equivalent to a minimum of five percent of the section 5 apportionment to the urbanized area." [12] Since the relevant "section 5 apportionment" for the Cleveland urbanized area for fiscal year 1977 is $9,198,205, 41 Fed.Reg. 27280 (July 1, 1976), an expenditure of approximately $460,000 would satisfy example one's guideline of five percent spending for "special efforts" programs. RTA's CRT program greatly surpasses this amount, however, since the authority's intracommunity transit service is budgeted at one million dollars for its first year of operation, it is anticipated that one-half million dollars will be spent to operate the intercommunity

---

10. Appendix to Subpart B of Part 613 of 49 C.F.R., 49 C.F.R. §§ 613.200–613.204. This appendix in relevant part provides:

UMTA will not specify a program design to meet the "special efforts" requirement. However, the following examples are illustrative of a level of effort that will be deemed to satisfy this requirement with respect to wheelchair users and semiambulatory persons:

1. A program for wheelchair users and semi-ambulatory handicapped persons that will involve the expenditure of an average annual dollar amount equivalent to a minimum of five percent of the section 5 apportionment to the urbanized area. . . .

2. Purchase of only wheelchair-accessible new fixed route equipment until one-half of the fleet is accessible, or, in the alternative, provision of a substitute service that would provide comparable coverage and service levels.

3. A system of any design, that would assure that every wheelchair user or semi-ambulatory person in the urbanized area would have public transportation available if requested for 10 round-trips per week at fares comparable to those which are charged on standard transit buses for trips of similar length, within the service area of the public transportation authority. The system could,

for example, provide trip coupons to individuals who would then purchase the needed service.

These examples are illustrative of a level of effort that will satisfy the "special efforts" requirement. They are not regulatory standards or minimums, neither do they exhaust all valid approaches. They are meant to guide the development of local public transportation opportunities for wheelchair users and semiambulatory persons that in fact meet a significant fraction of the identified need within a reasonable time.

11. The second example, which involves the purchase of wheelchair-accessible fixed route equipment, is not argued to be applicable to the facts of this case. The federal and local defendants' argument concerning the applicability of the first and third examples is unrefuted in the briefs of the plaintiff.

12. The term "section 5 apportionment" as used in this example refers to the amount of federal assistance available to an urbanized area under section five of the Urban Mass Transportation Act, 49 U.S.C. § 1604. These funds are allocated on the basis of population and population density.

system in its first year, and the cost of the thirty vehicles slated for CRT under the challenged grant is $847,000. RTA therefore clearly meets and surpasses the UMTA's first example of section 16(a) "special efforts."

The UMTA's third example of section 16(a) compliance is also met on this record. This example contemplates:

A system, of any design, that would assure that every wheelchair user or semi-ambulatory person in the urbanized area would have public transportation available if requested for 10 round-trips per week at fares comparable to those which are charged on standard transit buses for trips of similar length, within the service area of the public transportation authority. . . .

The defendants anticipate that Extra Lift will provide just such service on a county-wide basis, while CRT's intracommunity transit currently provides such transportation in a more limited geographic area. The fare for Extra Lift will be one-half that of the standard RTA fare, while the intracommunity service of CRT is free. Thus the court finds that CRT satisfies the third UMTA example of section 16(a) "special efforts".

13. The court finds that these various provisions are all satisfied separately and independently of one another. Thus the fact that RTA's level of service for the mobility handicapped satisfies two of the three examples contained in the appendix to 49 C.F.R. §§ 613.200–613.204 is not considered determinative of whether or not the applicable statutes and other regulations have been complied with. On the total record in this case, however, the court concludes that all applicable statutory and administrative requirements have been met.

14. The court notes that the board of directors of the Southern California Rapid Transit District adopted its policy of total accessibility in October, 1974, but that the District does not expect the first phase of the implementation of its policy to begin before the end of 1977. This serves as a good example of the time necessary to implement any adequate transit program for the mobility handicapped and supports this court's conclusion that while substantial good faith efforts toward mass transit comparability have been mandated by Congress, instantaneous comparability is not required.

The court now concludes, after examining the additional documentary evidence submitted by the parties, that the Regional Transit Authority and the Urban Mass Transportation Administration are in full compliance with the Urban Mass Transportation Act of 1964, the Rehabilitation Act of 1973, and all regulations promulgated thereunder.[13] The court is convinced that the efforts of RTA will result in transit comparability for the mobility handicapped "within a reasonable period of time" and finds no action of the UMTA to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Plaintiff cites this court to the approach of the Southern California Rapid Transit District to the provision of transportation for the mobility handicapped. Although this particular transit district chose to make its fixed route facilities fully accessible to the handicapped, this is not the only valid approach to meeting the federal mandate prohibiting discrimination against the elderly and handicapped.[14] It is not the job of this court to determine whether or not the defendants in this case have adopted the "best" approach to the transit problems of the mobility handicapped in the Cleveland area.[15] The court can merely decide wheth-

15. It is, indeed, misleading to classify any particular transit program as the "best" solution to the transportation needs of the elderly and handicapped, since the features of a particular approach that make it attractive to one segment of the mobility handicapped population may actually be disadvantageous to other handicapped persons. Some people may prefer total accessibility of fixed route equipment, while other mobility handicapped individuals may not only prefer, but require, curb to curb service. As the urban transportation planning regulations themselves provide, "[i]n carrying out planning for wheelchair users and semiambulatory persons, a range of alternative service improvements should be evaluated as to coverage, cost, and benefit." Handicapped and elderly associations and individuals were actively involved in the RTA evaluation and selection process which led to the adoption of the Community Responsive Transit program. Such a selection process is, of necessity, one for branches of government other than the judiciary.

er or not the defendants have satisfied their statutory and regulatory obligations.

Since the court finds that the defendants are in full compliance with all provisions of the applicable law, the defendants' motions for summary judgment are granted.

IT IS SO ORDERED.