## Sanitary Water Board of Commonwealth of Pennsylvania v. Wilkes-Barre, Appellant.

Argued September 14, 1962. Before RHODES, P. J., ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ.

*Peter Paul Olszewski,* Special Counsel, with him *Raymond F. Lowery,* City Solicitor, for City of Wilkes-Barre, appellant.

*William M. Gross,* Assistant Attorney General, with him *Joseph L. Cohen,* Assistant Attorney General, and *David Stahl,* Attorney General, for Sanitary Water Board, appellee.

OPINION BY WOODSIDE, J., November 15, 1962:

The basic question here is whether the City of Wilkes-Barre may continue to discharge its untreated sewage into the Susquehanna River or whether it must construct a sewage treatment works.

The case comes before us on appeal from an order of the Court of Common Pleas of Dauphin County dismissing an appeal from the adjudication of the Sanitary Water Board ordering the City of Wilkes-Barre to discontinue its discharge of untreated sewage into the river and to take immediate steps for the construction of sewage treatment works.

There was a time when the streams of this Commonwealth flowed clear, sparkling and pure. As the forests gave way to the plowed fields, rains eroded mud into the streams, and as the population grew and the wastes of mining and industry multiplied, the character of the streams changed. No effort was made to keep their waters pure. The streams were a convenient and cheap means for disposing all manner of waste, some dangerous, some harmless and some which neutralized others. At the turn of the century, nearly all the Commonwealth's streams and all its great rivers were contaminated by industrial, mining and human waste. Pollution was rampant.

In 1905 the legislature took a first, but small, step to limit the discharge of "obnoxious sewage" into the waters of this Commonwealth by passing an act "To preserve the purity of the waters of the State, for the protection of the public health". Act of April 22, 1905, P. L. 260. Two years later, in a case challenging the constitutionality of the above act, this Court and the Supreme Court recognized that the discharge of obnoxious sewage into the waters of the state was a matter of public concern and within the police powers of the Commonwealth to regulate. *Commonwealth v. Emmers,* 33 Pa. Superior Ct. 151 (1907), 221 Pa. 298, 70 A. 762 (1908).

The Pure Streams Act of June 22, 1937, P. L. 1987, put the Commonwealth firmly on the path of reducing the pollution of its waters. This act was bitterly fought at the time of its enactment, and since, as an extravagant change of accepted practices of long standing. Yet, everyone knows that ultimately the state will prevent all harmful pollution of its waters. Section 201 of this act, 35 P.S. §691.201 provides, inter alia, that "No . . . municipality shall . . . continue to discharge . . . into any of the waters of the Commonwealth any sewage, except as hereinafter provided in this act."

Section 202 of the Pure Streams Act, 35 P.S. §691.202 provides, inter alia, as follows: "Any municipality discharging sewage from any sewer system owned and maintained by the municipality, . . . shall discontinue the discharge of sewage into or in such manner as to cause pollution of the waters of this Commonwealth upon the order of the [Sanitary Water] board, issued pursuant to the provisions of this act, at such time as the board shall be of the opinion that such discharge of sewage is or may become inimical or injurious to the public health, animal or aquatic life, or to the use of the water for domestic or industrial consumption or recreation, and on such notice, any permit heretofore granted to such municipality or person for the discharge of sewage into the waters of the Commonwealth shall be deemed to be revoked and annulled: Provided, however, That the discharge of sewage into a stream impregnated with acid coal mine drainings be permitted when the discharge of sewage does not create a condition inimical to the public interest."

Section 203 of the above act of 1937, P. L. 1987, 35 P.S. §691.203, provides: "In the case of a municipality, orders to discontinue existing discharges of sewage shall be by notice in writing (after investigation and hearing and an opportunity for all persons interested therein to be heard thereon), which notice shall be

served personally or by registered mail on the corporate authorities of the municipality owning or maintaining and using the sewage system. The length of time, after receipt of the notice, within which the discharge of sewage shall be discontinued shall be stated in the notice, and shall in no case exceed two years."

Clothed with the authority conferred upon it by the above act, the Sanitary Water Board held a hearing concerning the discharge of sewage by the City of Wilkes-Barre into the Susquehanna River, took extensive testimony and filed an adjudication. It found from sufficient evidence that the City of Wilkes-Barre is discharging untreated sewage into the Susquehanna River; that the sewage contains toilet flushings, kitchen and wash bowl drainage, hospital drainage and industrial wastes; that the discharge contains grease and scum, and bacteria and pathogenic organisms from persons who are diseased and is inimical and injurious to the use of the water for domestic and industrial consumption and recreation. It thereupon concluded that the city should discontinue the discharge of its sewage into the Susquehanna River and accordingly entered the order from which the city appealed to the Court of Common Pleas of Dauphin County which, as the Commonwealth Court, had jurisdiction of the appeal.

That court in an opinion by Judge, now President Judge, WALTER R. SOHN dismissed the appeal, saying: "It appears from the discussion of the Sanitary Water Board in its adjudication that the City of Wilkes-Barre has a population of approximately 63,000 persons, and is situated in an area of about eight square miles on the left bank of the north branch of the Susquehanna River. Sewage is carried through a sewer system owned and maintained by the city and is discharged into the river through nine sewer outfalls. Approximately 13,000,000 gallons of raw sewage is discharged into the river every day.

"The Susquehanna River, below the city, is used for water supply purposes and for other agricultural, industrial and recreational purposes. The sewage entering the river at the outfalls is gray in color and has an obnoxious odor. It contains grease and fecal matter. The sewage mixes with the river water and discolors it. Carp are attracted to the area around the outfalls and, because of their presence, children often stand on the banks of the river, close to the sewage, to fish.

"The sewage from the City of Wilkes-Barre is the ordinary raw sewage from residential, commercial and industrial establishments. It contains washings of households, including toilet flushings and kitchen and wash bowl drainage. It includes industrial wastes and hospital drainage. The sewage contains bacteria and pathogenic organisms from persons who are diseased. It has floating scum and grease and contains organic suspended materials which settle out and form sludge banks with resultant odors from decomposition. It tends to coat the shores with settleable solids and with grease and scum.

"The sewage is objectionable in public water supplies because of the dangers to public health from the pathogenic organisms. Persons using the water downstream as a public water supply may be endangered if the water treatment facilities fail. Pathogenic organisms in the untreated water may reach the water supply.

"The sewage is objectionable to recreational use because persons may come into contact with the pathogenic organisms. Boats are coated with grease and scum. Organisms in the sewage use up the oxygen supply of the water to the extent that in many cases fish are killed. The only kind of fish found in the vicinity of sewage outlets are fish such as carp and suckers. Persons who fish along the streams naturally come in-

to contact with the implements they use, fish lines, etc., and this represents a danger to their health.

"From a medical standpoint raw sewage is objectionable because it contains the disease-producing bacteria found in the urine and fecal matter of diseased persons and carriers. This is particularly true of diseases involving the gastro-intestinal tract, the stomach and the intestines—primarily typhoid fever, dysentery, half a dozen different types of dysentery organisms, and the infections which are related to the typhoid organisms which produce less severe illness in adults but more severe illness in infants and children under one year of age.

"Primary treatment of sewage includes the settling of solids, fecal matter primarily, and would thus remove the great bulk of the bacteria which are found in the fecal matter. Chlorination of the effluent would reduce by 98 or 99 percent the pathogenic material in the effluent."

It is evident that the City of Wilkes-Barre is discharging its untreated sewage into the Susquehanna River and that the Sanitary Water Board found that such discharge is or may become inimical or injurious to public health, animal or aquatic life, or to the use of the water for domestic or industrial consumption or recreation. It is difficult to see how the board could have found otherwise. It is evident that the untreated sewage of a city of approximately 60,000 population when discharged into the north branch of the Susquehanna River is or may become inimical or injurious to public health, animal and aquatic life and to the use of the water for consumption and recreation. It would seem reasonable to accept this as an indisputable fact.

According to the evidence, Scranton and Wilkes-Barre are the only two cities of over 25,000 population now discharging untreated sewage into the waters of this Commonwealth. When the Act of 1937 was en-

acted, it was recognized that cleaning the streams would be a long, expensive process for both industry and taxpayer, and that the Sanitary Water Board could best serve the interests of this Commonwealth by proceeding fairly but firmly in carrying out the expressed policy of the Commonwealth to stop harmful pollution of its waters. Substantial progress has been made in the construction of sewage disposal or treatment plants by large and small communities since the passage of the Act of 1937. Some communities and some industries have found the solution of their pollution problem to be both difficult and costly. It is, of course, the expressed policy of this Commonwealth that the Sanitary Water Board should bring action with reasonable dispatch against those communities and industries which are not doing all in their power to prevent or reduce pollution.

The City of Wilkes-Barre asks to be relieved of its responsibility to treat its sewage. It has a unique problem in that it suffers from land subsidence which is particularly severe in the area where the collecting sewer lines and the treatment plant must be located. It also points to the acid coal mine drainage which pollutes the rivers but at the same time helps neutralize the sewage.

The city solicitor argues to us that the order of the Sanitary Water Board "is discriminatory, unjust, unreasonable, inequitable, economically inadvisable and constitutes a waste of the taxpayers' money." The city, he says, "is not opposed to the general concept of the Clear Streams Act as well as the fact that raw sewage of itself is generally objectionable." It is the unique earth subsidence problem of the city which he claims should relieve it from the responsibility imposed upon other municipalities.

It cannot be denied that Wilkes-Barre will have some problems in complying with the board's order to

construct a sewage treatment plant, but other communities and industries have had problems and were forced to expend vast sums to prevent pollution. The time has come, says the board, for Wilkes-Barre to join the ranks of these other cities and boroughs, and to stop using the Commonwealth waters as its open sewer. There is nothing discriminatory, unjust, unreasonable, or inequitable in the board's order. The legislature gave to the board certain specific tests to be applied in determining whether a city should be required to cease discharging untreated sewage into the Commonwealth's waters. Whether it is economically inadvisable for the city to build a sewage treatment plant or whether such construction may constitute a waste of taxpayers' money, were not among the tests. Discontinuance of the discharge should be ordered, says the legislature, not when it is found economical to do so, but when "the board shall be of the opinion that such discharge of sewage is or may become inimical or injurious to the public health, animal or aquatic life, or to the use of the water for domestic or industrial consumption or recreation, . . .". These are the tests given by the legislature to the board. When these tests are applied to this case, there can be no doubt that the board acted properly.

The city contends that the findings of the board are not supported by substantial evidence. There can not be the slightest doubt that the evidence sustains the finding that the city is discharging its sewage into the Susquehanna River, and that the evidence fully supports the board's opinion that such discharge is or may become inimical or injurious to the public health, animal and aquatic life.

After making findings on these vital points, the board went on to find that, "The possibility of future earth movement in the Wilkes-Barre area should not prevent the construction and operation of properly de-

signed sewage treatment facilities," and that "The City of Wilkes-Barre can have a sewage treatment plant, and necessary interceptors, designed to withstand the effect of any future earth movement which can reasonably be expected."[1] The city's position is that there is insufficient evidence to support these last two findings.

There is opinion evidence in the record to support these findings, but we will not dwell upon it, because we do not consider either the evidence or the findings necessary to the determination of this case. The law must not bury its eyes so deeply in the opinions of experts that it is unable to see the realities obvious to everyone. The truth of the matter is Wilkes-Barre is a living, vital city. Its people are, and of necessity must be, supplied daily with water, gas, electricity and heat. The sewage is taken from their homes and business places in pipes. It has bridges and elaborate and expensive flood control equipment; its streets and its pavements are kept open and useable and its buildings are not crumbling. It must and does meet the problems peculiar to the earth movements of the community.

To suggest that it can conquer the problems of land subsidence in every respect except in the construction of intercepting sewer lines and the construction of a sewage disposal plant is unrealistic. It may be difficult and expensive to solve its problem, and after construction of the plant there may be more than the usual number of repairs necessary, but the sewage disposal plant does not appear to be subject to insurmountable obstacles.

The Sanitary Water Board in entering its order against the City of Wilkes-Barre was acting within the

---

[1] The board is concerned with these problems only indirectly at this time, but ultimately must approve the plans for the erection of the treatment plant under §308 of the Pure Streams Act of 1937, supra, 35 P.S. §691.308.

authority given it by the statute and is properly carrying out the firmly fixed policy of this Commonwealth to stop the pollution of its waters.

Order affirmed.