IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Hospitality Management Corp.,  :
:
Petitioner  :
:
v.  : No. 380 C.D. 2017
: Submitted: September 11, 2017
Commonwealth of Pennsylvania,  :
Department of Labor and Industry,  :
Office of Unemployment  :
Compensation Tax Services,  :
:
Respondent  :


BEFORE:    HONORABLE ROBERT SIMPSON, Judge
HONORABLE ANNE E. COVEY, Judge
HONORABLE MICHAEL H. WOJCIK, Judge

OPINION BY JUDGE WOJCIK                    FILED: October 3, 2017


Hospitality Management Corporation (HMC) petitions for review from a final order of the Commonwealth of Pennsylvania, Department of Labor and Industry (Department), which upheld the decision of the Office of Unemployment Compensation Tax Services (Office) denying HMC's appeal of its unemployment compensation (UC) contribution rates. HMC contends that the Department erred, as a matter of law, or otherwise abused its discretion, in its interpretation of Sections 301(e) and (j) of the Unemployment Compensation Law (Law),[1] when it concluded that the Office's two-year delay in issuing revised UC rates complied with the prompt notice requirement under the Law. Upon

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §781(e), (j).

concluding that the Office acted within a reasonable time in revising UC rates under Section 301(j) of the Law, we affirm.

## I. Background

This case involves UC tax rates that the Office assigned to HMC for tax years 2011-2012. HMC, which is a family-owned, Pennsylvania corporation operating in the restaurant and food industry, began paying wages in Pennsylvania in 1997. The owners and officers of HMC were also owners and officers of two other entities, Altland House of Abbottstown, Inc. (AHA) and Altland House Catering, Inc. (AHC), which they established in the late 1980s and 1990s, respectively. AHA and AHC merged all of their assets and business operations into HMC, with HMC continuing these operations in March 2011. AHA and AHC last paid wages to their employees on December 30, 2010. As of January 1, 2011, HMC began paying wages to the employees formerly employed by AHA and AHC. HMC did not notify the Office of the mergers of AHA and AHC into HMC until September 2012.

Unaware of the mergers, the Office initially assigned rates to HMC for calendar years 2011 through 2014 that included only HMC's UC experience and did not include the UC experience of AHA and AHC.[2] The Office continued

---

[2] Under federal and state law, the collection of UC contributions from employers operates on an "experience-based" system, which means that an employer's risk of unemployment directly relates to how much the employer must pay in contributions to the UC Fund. Similar to other forms of insurance, employers with high unemployment (i.e., former employees who were laid off through no fault of their own collecting UC benefits) can expect to pay contributions at higher contribution rates, and employers with stable employment history and low unemployment can expect to pay contributions at lower rates. *See* Section 301.1 of the Law, added by the Act of December 17, 1959, P.L. 1893, *as amended,* 43 P.S. §781.1; Section 3303(a)(1) of the Federal Unemployment Tax Act, 26 U.S.C. §3303(a)(1). To support the experience rating, federal and state law mandate the transfer of UC experience from a predecessor entity to a successor entity when the predecessor and successor share common ownership or control. In Pennsylvania, if an
**(Footnote continued on next page…)**

to assess rates and delinquencies to AHA and AHC, which culminated in notices of assessment against them. In September 2012, after AHA and AHC received the notices of assessment, HMC notified the Office of its merger with AHA and AHC. The Office withdrew the notices of assessment and placed the AHA and AHC accounts in inactive status for UC purposes. R.R. at 89a-90a.

On September 9, 2014, two years after learning of the merger, the Office transferred the UC experience of AHA and AHC to HMC and issued revised rates notices, which resulted in significantly higher rates for HMC. Since the higher rates resulted in more contributions due, the Office revised the delinquency rates for 2012 through 2014. Specifically, the Office assigned HMC the following rates:

| Year | Original Rate | Revised Rate | Delinquency Rate |
|------|---------------|--------------|------------------|
| 2011 | .026770 | .076496 | -- |
| 2012 | .030718 | .077270 | .109010 |
| 2013 | .043775 | .080560 | .112090 |
| 2014 | .049030 | .072152 | .103682 |

*See* Reproduced Record (R.R.) at 11a-24a, 129a-130a. The Office offered to waive the delinquency rates for 2012 through 2014 if HMC paid the contributions due or entered into an approved-payment plan. HMC chose neither option. Instead, HMC filed timely rate appeals for 2011 through 2014.

---

**(continued…)**
employer transfers its organization, trade, business or workforce to another employer, and both employers share common ownership, control or management, Section 301(d)(1)(B) of the Law, 43 P.S. §781(d)(1)(B), requires the Office to transfer the UC employer experience of the predecessor to the successor.

On December 31, 2014, the Office issued a 2015 rate notice to HMC with a delinquency rate of .091070, which HMC also appealed. The Office again offered additional opportunities to avoid the delinquency rates and accrued interest if HMC paid the contributions or entered into an approved payment plan, which did not occur.

By letter dated July 10, 2015, the Office denied HMC's rate appeals for 2011, 2012, 2014, and 2015.[3] R.R. at 54a-57a, 131a. HMC appealed the denial to the Department's UC Tax Review Office, which held a hearing on March 7, 2016.[4] Following the hearing, only the 2011 and 2012 rates remained at issue, which equated to an amount due of $152,378.78. The parties submitted post-trial briefs. HMC asserted that the Law prohibits retroactive rate revision and requires prompt notification of UC rate contributions. Because the Office allowed two years to pass after learning of the merger before adjusting HMC's rates, HMC argued the original rates must be reinstated. The Department rejected HMC's argument finding that the two-year period did not constitute an unreasonable delay warranting a reversion of the rates particularly where HMC's failure to timely report its acquisition of AHA and AHC contributed to the error. On March 1, 2017, the Department denied HMC's appeal of its UC contribution rates. HMC then petitioned this Court for review.[5]

---

[3] In an effort to resolve the matter, the Office reinstated the pre-transfer, original rate of .043775 for 2013.

[4] On or about January 20, 2016, HMC and the Office entered into a payment plan. R.R. at 62a.

[5] Our review is limited to determining whether constitutional rights were violated, whether the adjudication is in accordance with the law or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. **(Footnote continued on next page…)**

4

## II. Issue

HMC seeks a revision of its contribution rates for 2011 and 2012 only. HMC contends that the Department erred or abused its discretion in determining that the Office's two-year delay in issuing revised UC rates complied with the Law. According to HMC, the Law clearly obligates the Office to "promptly notify" each employer of its rate contribution for the given calendar year. 43 P.S. §781(e)(2). Even in cases where an employer is erroneously notified of a UC rate, the Law contemplates that the Office revises the rate within a one-year time period. 43 P.S. §781(e)(2), (j). By September 21, 2012, the Office knew of the merger of HMC into and with AHA and AHC. *See* R.R. at 89a-90a. Notwithstanding, the Office waited for two years before issuing revised rates. The Department's finding that this two-year delay is not unreasonable is based entirely on HMC's role in failing to initially notify the Office of the merger. HMC maintains that the Department's finding is contrary to the Law because the Law clearly contemplates that the Office must act "promptly" in issuing revised rates. To accept the Office's argument, and the rationale relied upon by the Department, would mean that, in cases where the Office learns of an error in an assigned rate, to which an employer contributed, there would be absolutely no time limit under which the Office must act to issue the revised rate. For these reasons, HMC requests this Court to hold that the Department's finding that this two-year delay is

**(continued…)**

§704; *Resource Staffing, Inc. v. Unemployment Compensation Board of Review*, 995 A.2d 887, 890 (Pa. Cmwlth. 2010). As to questions of law, our scope of review is plenary and our standard of review is *de novo*. *Slippery Rock Area School District v. Unemployment Compensation Board of Review*, 983 A.2d 1231, 1236 (Pa. 2009).

not unreasonable is contrary to the Law and to reinstate the original rate notices for 2011 and 2012.

### III. Discussion

Contributions collected from employers provide the reserves necessary to pay UC benefits to workers who are unemployed through no fault of their own. Section 3 of the Law, 43 P.S. §752. The Office is the agency charged with the assessment and collection of these contributions. 34 Pa. Code §63.26. In order to assign employers the correct contribution rates based on their UC experience, which in turn ensures that the UC Fund is adequately funded, they must have accurate information regarding the employer's UC experience, including any experience transferred from a predecessor. Section 301(d) of the Law, 43 P.S. §781(d). It is incumbent on employers to provide the Office with this information. Section 315 of the Law, 43 P.S. §795. Specifically, Section 315(a)(2) of the Law requires:

> An employer that transfers its organization, trade, business or work force, in whole or in part, whether such transfer was by merger, consolidation, sale or transfer, descent or otherwise, and the person, corporation, unincorporated association or other entity to whom the transfer is made, *shall report the transfer to the department . . . within thirty (30) days after the date of the transfer . . . .*

43 P.S. §795(a)(2) (emphasis added).

In support of its position that the Office's two-year delay for rate revision was contrary to the law, HMC relies on Section 301(e)(2) of the Law, which provides:

6

*The department shall promptly notify each employer of his rate of contribution for the calendar year*, determined as provided in this section and sections 301.1, 301.2 and 301.6 of this act. The determination of the department of the employer's rate of contribution shall become conclusive and binding upon the employer, unless within ninety (90) days after the mailing of notice thereof to the employer's last known post office address the employer files an application for review, setting forth his reasons therefor: Provided, *That if the department finds that because of an error of the department it has notified an employer that his rate of contribution is more than the rate to which he is entitled, the department shall, within one year from the date of such notice, adjust the rate of contribution.* The department may, if it deems the reasons set forth by the employer insufficient to change the rate of contribution, deny the application, otherwise it shall grant the employer a fair hearing. The employer shall be promptly notified of the denial of his application or of the department's redetermination. In any application for review filed hereunder and in any further appeal taken thereafter, no questions shall be raised with respect to the employer's contribution rate, except such as pertains to the determination of the employer's Benefit Ratio Factor and Reserve Ratio Factor.

43 P.S. §781(e)(2) (emphasis added). According to HMC, once the Office became aware of the merger, it had one year to adjust the rate error. However, this section applies to the initial issuance of an employer's rate of contribution. The Office complied with this requirement by issuing initial rates to HMC for 2011 and 2012, on December 31, 2010 and February 29, 2012, respectively.[6] The Office later issued revised notices upwardly adjusting those rates.

---

[6] Section 301(e)(2) also addresses redeterminations for downward revisions based on an employer's application for review. 43 P.S. §781(e)(2).

Section 301(j) of the Law is the sole provision providing express guidance on the upward revision of rates. Specifically, Section 301(j) provides:

> If the department finds that it has erroneously notified an employer that his rate of contribution is less than the rate to which he is entitled, he shall be notified of the revision of his rate and he shall be required to make payment of additional contributions on the basis of the revised rate: *Provided, That no such additional contribution shall be required unless the employer is notified of his revised rate not later than December thirty-first of the calendar year to which the rate is applicable, unless the department finds that the employer has directly or indirectly contributed to the error:* Provided further, That no interest shall be required to be paid in connection with such additional contributions if they are paid within thirty (30) days from the date that the employer is notified of his revised rate, unless the department finds that the employer has directly or indirectly contributed to the error.

43 P.S. §781(j) (emphasis added). Section 301(j) delineates two types of errors causing an incorrect rate: (1) an error by the Department, for which the Department must issue a revised rate by the end of the applicable year; and (2) an error to which the employer contributed, which has no statutory deadline by which a revised rate must be issued. *Id.* In other words, Section 301(j) authorizes the Office to upwardly revise a contribution rate *after* the end of the applicable calendar year if the employer contributed to the error. *Id.*

HMC attempts to conflate Sections 301(e)(2) and 301(j) to require prompt action within one calendar year for all rate revisions, but it offers no support for this statutory interpretation. We decline to erect a statute of limitations for the collection of a tax by a governmental unit where the General Assembly did not see fit. *See Tyrone Area School District v. Delbaggio*, 638 A.2d 416, 418

8

(Pa. Cmwlth. 1994) (such would be an act of judicial legislation, which is beyond our scope of authority); *see also Commonwealth v. Fedorek*, 946 A.2d 93, 98 (Pa. 2008) ("[T]he clearest indication of legislative intent is the plain language of the statute itself.").

Although Section 301(j) does not contain a time limit to revise the rates where an employer contributed to the error, there is support that the Office must act within a reasonable time. *See The Glidden Company, Inc. v. Department of Labor and Industry*, 700 A.2d 555 (Pa. Cmwlth. 1997), *appeal denied*, 717 A.2d 535 (Pa. 1998); *Commonwealth v. Kellner*, 72 Pa. D.&C. 209 (C.P. Dauphin 1950). The Office, like other governmental units, must act in good faith in discharging its duties. *See Office of Governor v. Donahue*, 98 A.3d 1223, 1239 (Pa. 2014). This means that the time period to revise an erroneous rate resulting from an employer's error is not unlimited. *See Glidden; Kellner*.

In *Glidden*, the employer applied for "new employer" status under the Law in December 1986. The Department denied the application in April 1991 and retroactively increased Glidden's UC tax rate. On appeal, the employer argued that this Court should reverse the Department's decision because the Bureau of Employment and UC (Bureau) failed to promptly notify it of its contribution rate as required by Section 301(e)(2) of the Law. The employer argued that the Bureau violated the statutory requirements and equitable tax principles by taking more than four years to process the employer's tax application of "new employer" status and accepting the employer's tax payments at the new employer rate without objection. The Court, in *dicta,* opined that the Department's failure to act on the

9

application "for over four years was unreasonable."[7]  *Glidden*, 700 A.2d at 559. Although *Glidden* did not involve a rate revision under Section 301(j) or an employer who contributed to the erroneous contribution rate, its brief discussion of reasonableness is nevertheless persuasive here.

In *Kellner*, the Bureau erroneously assigned the petitioners a rate of 1% for the year 1947, having failed to properly assign benefit wage charges to one of petitioners' predecessors, which would have resulted in a rate of 2.7%.  Upon discovering the error in 1948, the Department notified petitioners that their experience factor for the years 1946 and 1947 would be recomputed to include supplemental charges omitted from the previous computation.  On appeal, the Court of Common Pleas of Dauphin County[8] reversed.  The court cautioned that employers would face significant financial concerns without some type of limitation on the Department in revising contribution rates.  The court opined:

> Considering the large sums involved between the
> minimum and maximum rate of compensation and the

---

[7] We concluded the issue was waived because the employer did not raise the issue at the administrative hearing or in its appeal.  *Glidden*, 700 A.2d at 559.

[8] Prior to the creation of Commonwealth Court, the Court of Common Pleas of Dauphin County served some functions akin to those served by the present Commonwealth Court, and we view those decisions as established precedent of this Court.  *See Vlasic Farms, Inc. v. Pennsylvania Labor Relations Board*, 734 A.2d 487, 491 (Pa. Cmwlth. 1999), *aff'd*, 777 A.2d 80 (Pa. 2001) (recognizing the Court of Common Pleas of Dauphin County as the predecessor to the Commonwealth Court); *Common Cause of Pennsylvania v. Commonwealth*, 668 A.2d 190, 203 (Pa. Cmwlth. 1995), *aff'd*, 677 A.2d 1206 (Pa. 1996) (same); *Department of Health v. Crown Nursing Home*, 362 A.2d 491, 493 (Pa. Cmwlth. 1976) (recognizing the transfer of jurisdiction to the Commonwealth Court of those classes of cases previously heard by the Court of Common Pleas of Dauphin County as the court wherein the seat of State Government is located); *see also Smiley v. Heyburn*, 133 A.2d 806, 807 (Pa. 1957) (referring to "[t]he Court of Common Pleas of Dauphin County, sitting as Commonwealth Court . . . ."); *Sanitary Water Board v. City of Wilkes-Barre*, 185 A.2d 624, 626 (Pa. Super. 1962) (same).

> small margin of profit under which many concerns operate, the necessity of having tax liability definitely determined *within a reasonable time becomes apparent*.

*Id.* at 211 (emphasis added). Although *Kellner* is readily distinguishable because it preceded the enactment of Section 301(j) and did not involve an employer who contributed to the error, its discussion regarding the need for finality in tax matters within a reasonable time is sound and fully applicable here.

Here, there is no dispute that HMC contributed to the erroneous UC rate. HMC failed to satisfy its statutory obligation under Section 315(a)(2) to report the transfer of AHA and AHC into HMC to the Office within 30 days of the date of the transfer, which occurred on January 1, 2011. R.R. at 107a. Rather, it was not until September 2012, after the Office had already assessed AHA and AHC over $160,000 for contributions, interest and penalties due for the second quarter of 2011 through the first quarter of 2012, that HMC first provided the Office with information on the mergers by filing Section 14 of the Pennsylvania Enterprise Registration, Form PA-100, entitled "Predecessor/Successor Information" (Section 14 form) for both AHA and AHC. *See* R.R. 89a, 90a, 123a, 129a, 135a. Because HMC failed to report the transfer, the Office initially assigned rates for 2011 and 2012 that were lower than they should have been. HMC's disclosure of the transfer triggered the Office to upwardly revise HMC's rates for the calendar years following the transfer to ensure that HMC is properly contributing to the UC Fund based on the combined UC experience of AHA, AHC and HMC. The Office revised the rates for 2011 and 2012 on September 9, 2014, two years after it received notification of the merger.

The pertinent question on appeal is whether the Office's two-year delay in revising the rates was reasonable, which must be determined on a case-by-

11

case basis. The Office asserts that it faces various factors and complexities when processing a transfer when the employer contributes to the error. Specifically, when an employer fails to disclose a merger or other business transfer, its ability to process that transfer may be affected by factors such as how long the transfer went undisclosed, the number of predecessor entities, and the cooperation of the entities involved. The Office must investigate to obtain the information required to process the transfer of UC experience.

In this case, the Office investigated the transfer and determined that the Section 14 forms submitted by HMC did not have the correct acquisition date. R.R. at 113a. The forms had the acquisition date of March 31, 2011. R.R. at 107a. However, the correct acquisition date was January 1, 2011. R.R. at 107a, 108a. Contrary to HMC's assertions, the Office did not have all relevant information regarding the transfer upon receiving the Section 14 forms in September 2012. *See id*. The Office investigated and resolved the issue in June 2014. R.R. at 108a-09a. The Office revised the rates shortly thereafter in September 2014. Under the circumstances, the two-year period between HMC's notification of the transfer and the Office's rate revision was not unreasonable.

Accordingly, we affirm.

_____
MICHAEL H. WOJCIK, Judge

12

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Hospitality Management Corp.,        :
                                     :
                    Petitioner       :
                                     :
        v.                           :   No. 380 C.D. 2017
                                     :
Commonwealth of Pennsylvania,        :
Department of Labor and Industry,    :
Office of Unemployment               :
Compensation Tax Services,           :
                                     :
                    Respondent       :

## O R D E R

AND NOW, this 3rd day of October, 2017, the order of the Commonwealth of Pennsylvania, Department of Labor and Industry, dated March 1, 2017, is AFFIRMED.

_____
MICHAEL H. WOJCIK, Judge